STATE OF NORTH CAROLINA v. WILLIAM DILLARD POWELL

No. 190A93

(Filed 28 July 1995)

1. **Evidence and Witnesses § 1226 (NCI4th)— inculpatory statements—request to speak off record—admission of subsequent statements as harmless error**

Assuming that the trial court erred by admitting in-custody statements in which defendant told an officer what weapon he had used in a murder, why he committed the crime, and how he disposed of the weapon after defendant asked to speak off the record and the officer tore up the *Miranda* waiver form defendant had signed, such error was rendered harmless by defendant's prior confession, before he asked to speak off the record, that he "went off on" the victim because she slapped him as he tried to rob the convenience store where she worked, combined with a witness's positive identification of defendant as the man in the store shortly before the crime and other strong circumstantial evidence.

**Am Jur 2d, Evidence §§ 709, 749.**

2. **Evidence and Witnesses § 1233 (NCI4th)— recording of telephone conversation with defendant—persons not agents of police—admission not Fifth Amendment violation**

The trial court properly found that defendant's girlfriend and a male friend were not acting as agents of the police when they tape recorded a telephone conversation with defendant while he was in jail awaiting trial for first-degree murder where the male friend testified that he recorded the conversation for "personal reasons"; the male friend and defendant's girlfriend both testified that no police officer asked them to record any conversation with defendant, although they had been told that any information they had regarding the murder would help; and the officer who told the male friend he would appreciate any information he had testified that he did not ask anyone to record telephone conversations with defendant. Therefore, the conversation did not constitute police-initiated questioning after defendant had requested and conferred with an attorney, and the admission of the recorded conversation and a transcript thereof did not violate defendant's Fifth Amendment rights.

**Am Jur 2d, Evidence § 620.**

3. **Jury § 141 (NCI4th)— capital sentencing—voir dire— parole eligibility beliefs**

The trial court did not err by denying defendant's pretrial motion to conduct *voir dire* inquiry regarding prospective jurors' beliefs about parole eligibility.

**Am Jur 2d, Criminal Law § 913.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

4. **Jury § 154 (NCI4th)— capital case—jury selection—jurors' views about mitigating and aggravating circumstances— question excluded—no abuse of discretion, prejudice, or statutory violation**

The trial court did not abuse its discretion by sustaining the State's objection to defendant's question to four prospective jurors in a capital trial that "if you have a doubt about whether the mitigating circumstances are outweighed by the aggravating circumstances, if the judge instructs you to that effect, do you

understand that you may not vote to execute the defendant?" since the question related to the jurors' understanding of the weighing process used at sentencing hearings, and the trial court properly could have concluded that it confused the jurors because they had not yet been instructed on the sentencing procedure. Furthermore, defendant was not prejudiced by the trial court's ruling where defendant asked the prospective jurors several questions relating to whether they would automatically vote to impose the death penalty, and those questions allowed defendant to ascertain whether the prospective jurors could consider a life sentence. Nor did the court's ruling violate N.C.G.S. § 15A-1214(c) since the court allowed both the prosecutor and defense counsel to "personally question prospective jurors," and the statute does not eliminate the trial court's duty to supervise *voir dire* or its discretion in that regard.

**Am Jur 2d, Jury §§ 206, 208, 279.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

5. **Evidence and Witnesses § 351 (NCI4th)— murder during robbery—cocaine use and assistance checks—admissibility to show motive**

In a prosecution for first-degree murder committed during the robbery of a convenience store, testimony by defendant's girlfriend about defendant's cocaine use and his receipt of AFDC and Social Security checks for the benefit of his son was properly admitted for the limited purpose of showing motive for the robbery-murder where the girfriend testified that defendant had supported himself and her and their cocaine habit when his only source of income was the AFDC and Social Security checks, and that defendant stopped receiving both checks when his former wife took physical custody of the son two months before the robbery-murder. Further, the trial court did not abuse its discretion in concluding that the probative value of this evidence outweighed its prejudicial effect.

**Am Jur 2d, Homicide § 311.**

STATE v. POWELL

[340 N.C. 674 (1995)]

6. **Evidence and Witnesses § 179 (NCI4th)— defendant's receipt of government checks—admissibility to show motive**

Testimony by a social worker that defendant had received checks from government agencies for his son until two months before a murder committed during the robbery of a convenience store was not improper character evidence and was relevant under Rules 401 and 404(b) to show motive. N.C.G.S. § 8C-1, Rules 401 and 404(b).

**Am Jur 2d, Criminal Law § 133; Evidence § 558.**

7. **Evidence and Witnesses § 263 (NCI4th)— character trait—admissibility for rebuttal—exclusion as harmless error**

Where the State had presented evidence that defendant's brother asked him to swear on his mother's grave that he did not commit a robbery-murder but defendant stated only that he had tried to borrow money from the brother right before the crime occurred, the trial court erred by excluding as hearsay testimony by defendant's former wife that defendant loved his mother dearly and, in her opinion, would never swear or profane his mother's grave, since the testimony was not hearsay but was relevant character evidence admissible under Rule 404(a)(1) to rebut the implication in the State's evidence that defendant declined to swear to his innocence because he knew he was guilty. However, the exclusion of this testimony was not prejudicial error because the testimony could not have affected the jury's verdict in light of all of the other evidence, including a partial confession and eyewitness identification of defendant at the scene near the time of the crime. N.C.G.S. § 8C-1, Rule 404(a)(1).

**Am Jur 2d, Evidence §§ 358, 363, 369.**

**Admissibility of evidence of pertinent trait under Rule 404(a) of Uniform Rules of Evidence. 56 ALR4th 402.**

8. **Criminal Law § 537 (NCI4th)— capital trial—announcement of guilty verdict—spectator outburst—denial of mistrial for sentencing phase**

The trial court did not abuse its discretion by denying defendant's motion for a mistrial prior to the sentencing phase of a capital trial because of an outburst from persons in the courtroom when the foreman read the guilty verdict where the court admonished the spectators that it would not allow anyone in the court-

STATE v. POWELL

[340 N.C. 674 (1995)]

room to engage in conduct in the jury's presence which would disrupt the administration of justice; the court also informed the audience that any further outbursts would be punished as contempt; when the jury reassembled for the sentencing phase, the court instructed that the jury should not allow the outburst to enter into its consideration of the issues of the case; and no juror indicated an inability to serve fairly when the court asked if any juror felt that he or she could no longer deliberate fairly and impartially as a result of the outburst.

**Am Jur 2d, Trial §§ 1738, 1739.**

**Emotional manifestations by victim or familty of victim during criminal trial as ground for reversal, new trial, or mistrial. 31 ALR4th 229.**

**9. Criminal Law § 1355 (NCI4th)— capital sentencing—mitigating circumstance—no significant criminal history—insufficient evidence**

Evidence presented at a capital sentencing hearing did not require the trial court to submit the statutory mitigating circumstance that "defendant had no significant history of prior criminal activity" where the only evidence about defendant's criminal past consisted of testimony about defendant's cocaine use and a passing reference by a witness to the fact that defendant was temporarily released from jail to attend his father's funeral in the 1980s; the witness did not state the offense for which defendant was incarcerated or the length of his sentence; and neither party mentioned defendant's criminal record or introduced it into evidence. N.C.G.S. § 15A-2000(f)(1).

**Am Jur 2d, Evidence § 1336.**

**10. Criminal Law §§ 452, 463 (NCI4th)— capital sentencing— prosecutor's jury argument—mitigating circumstances— lack of remorse—no gross impropriety**

The prosecutor did not denigrate the sentencing process during his closing argument in a capital sentencing proceeding but encouraged the jury to focus on facts he believed justified imposition of the death penalty when he told jurors to focus on the crime instead of the mitigating evidence, referred to some of the proffered mitigators as "lawyer talk," and mentioned the nonstatutory mitigating circumstance that "defendant has been a good prisoner while incarcerated in the Cleveland County Jail"

and asked "so what?" Further, the prosecutor did not mislead the jury by his shorthand description of the impaired capacity mitigating circumstance, N.C.G.S. § 15A-2000(f)(6), when he predicted that defense counsel would argue that defendant "didn't know what he was doing, that he didn't know that that was against the law to do something like [the murder]," and the prosecutor argued facts inferable from the evidence when he stated that defendant killed the victim for forty-eight dollars and showed no remorse. Therefore, none of the prosecutor's statements were so grossly improper that the trial court should have intervened *ex mero motu*.

**Am Jur 2d, Trial §§ 572, 841.**

**11. Jury § 113 (NCI4th)— capital trial—denial of individual voir dire—potential domino effect**

The trial court's denial of defendant's pretrial motion for individual *voir dire* in a capital trial did not violate defendant's constitutional rights. The Court has specifically rejected defendant's argument that a group *voir dire* creates a "domino effect" whereby a prospective juror learns which answers will enable him or her to avoid jury duty.

**Am Jur 2d, Jury §§ 198, 199.**

**12. Jury § 223 (NCI4th)— capital trial—jury selection—death penalty views—excusal for cause**

The trial court did not err by excusing four prospective jurors for cause in a capital trial where three stated that they could not vote for the death penalty under any circumstances and the fourth told defense counsel he could consider only a sentence of life imprisonment.

**Am Jur 2d, Jury § 279.**

**Comment Note— Beliefs regarding capital punishment as disqualifying juror in capital case—post-Witherspoon cases. 39 ALR3d 550.**

**13. Criminal Law § 1298 (NCI4th)— constitutionality of death penalty**

The North Carolina death penalty statute is not unconstitutional.

**Am Jur 2d, Criminal Law §§ 609-612, 628.**

STATE v. POWELL

[340 N.C. 674 (1995)]

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**14. Criminal Law § 1341 (NCI4th)— felony murder—armed robbery—pecuniary gain aggravating circumstance**

The trial court did not err by submitting the aggravating circumstance that a first-degree murder was committed for pecuniary gain where defendant's conviction rested solely on the felony murder rule with armed robbery as the underlying felony.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstaance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

**15. Criminal Law § 680 (NCI4th)— mitigating circumstances— peremptory instructions—necessity of request**

The trial court is not required to give peremptory instructions on mitigating circumstances absent a request by the defendant.

**Am Jur 2d, Criminal Law § 628.**

**16. Criminal Law § 1323 (NCI4th)— nonstatutory mitigating circumstances—instructions—finding of mitigating value**

The trial court did not err by instructing the jury that it could determine that a nonstatutory mitigating circumstance existed but had no mitigating value.

**Am Jur 2d, Criminal Law § 599; Trial § 1441.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**17. Criminal Law § 1363 (NCI4th)— nonstatutory mitigating circumstance—good prisoner—no mitigating value per se**

The trial court did not err by failing to instruct the jury that the nonstatutory mitigating circumstance that "the defendant has been a good prisoner while incarcerated in the Cleveland County Jail" had mitigating value *per se*.

**Am Jur 2d, Criminal Law § 599; Trial § 1441.**

**18. Criminal Law § 1327 (NCI4th)— capital sentencing— instructions—duty to recommend death sentence**

The trial court did not err by instructing the jury that it had a "duty" to recommend a sentence of death if it found that the mitigating circumstances were insufficient to outweigh the aggravating circumstance and that the aggravating circumstance was sufficient to call for such a penalty.

**Am Jur 2d, Trial § 1458.**

**19. Criminal Law § 1373 (NCI4th)— death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate to the sentence imposed in similar cases, considering both the crime and the defendant, where defendant killed a convenience store employee during a robbery of the store; the jury found the pecuniary gain aggravating circumstance and no mitigating circumstances; the evidence tended to show that the killing was particularly brutal in that the victim had numerous lacerations on her face with corresponding skull fractures underneath, part of her left ear was torn off, her nose was broken on the left side, her left eye was displaced due to a fracture of the bone behind the eye, she had lacerations on her forearm and hand which indicated that she struggled for her life, she had bone fragments imbedded in her brain from numerous fractures, and her brain was torn in some places and protruded from the skull in others; defendant used a tire iron to inflict these injuries; defendant acted alone and was forty-five years old at the time of the murder; and defendant left the victim to die in a pool of blood and never expressed remorse for his crime.

**Am Jur 2d, Criminal Law § 628.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Gaines, J., at the 12 April 1993 Criminal Session of Superior Court, Cleveland County, on a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 15 February 1995.

*Michael F. Easley, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*William F.W. Massengale and Marilyn G. Ozer for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of the first-degree murder of Mary Gladden, an employee of The Pantry on Charles Road in Shelby, and sentenced to death. He appeals from his conviction and sentence. We conclude that defendant received a fair trial, free of prejudicial error, and that the sentence of death is not disproportionate.

The State's evidence tended to show that the victim was killed on 31 October 1991 while on duty at The Pantry. Scott Truelove testified that he bought five dollars' worth of gasoline there between 3:15 and 3:30 a.m. on 31 October. At the counter he stood near a rough-looking man with unkempt, shoulder-length hair, facial hair, and a tattoo on his left forearm. The next morning Truelove read about the murder and gave a description of the man to Captain Ledbetter of the Shelby Police Department. On 16 November 1991 Truelove identified defendant as the man by picking him out of a photographic lineup.

On 31 October 1991 Clarissa Epps stopped at The Pantry to buy gasoline at approximately 4:15 a.m. She went in to pay for her purchase. After waiting in vain for a clerk to appear, Epps called out but received no answer. Epps then turned and saw the victim lying in blood behind the counter. Epps drove home and called the police.

Officer Mark Lee of the Shelby Police Department arrived at The Pantry at 4:26 a.m. on 31 October in response to a radio dispatch. Lee first ensured that all customers had left the store and then found the victim behind the counter. She was lying on her back in a pool of blood with her head toward the cash register and her hands at her sides. Lee noticed injuries to the victim's left eye and ear as well as other injuries to her head. He also saw a one-dollar bill on the floor near her left foot and another on the counter.

Dr. Stephen Tracey, who performed the autopsy, testified that the victim had numerous lacerations on her head and that her skull was fractured in several places. Additionally, her nose was broken and her left eye had been displaced by a fracture to the bone behind it. The victim's brain had hemorrhaged, was bruised and lacerated in several places, and contained skull fragments. Tracey determined that blunt trauma to the head caused the victim's death and that she died from the trauma before she lost a fatal amount of blood. He also concluded that human hands had not inflicted the wounds; he surmised from their size and shape that the perpetrator used a lug-nut wrench, a tire wrench, or possibly a pipe.

**STATE v. POWELL**

[340 N.C. 674 (1995)]

Mark Stewart, an employee of The Pantry, testified that he worked on 27 October and 1 November 1991. On 27 October Stewart saw a tire tool behind the counter to the side of the cash register. The tool had lain there for approximately one year. It was curved on one end with a round hole for a lug nut and was split on the other end for hubcap removal. Stewart noticed that the tool was missing when he worked on 1 November, the day after the murder.

Thomas Tucker, a district manager of The Pantry, testified that he arrived at The Pantry sometime after 6:00 a.m. on 31 October. He examined the cash register tape for that morning; it showed, among other transactions, a gasoline sale of five dollars at 3:29 a.m. and a no-sale at 3:35 a.m. The cash register enters a no-sale when it is opened but no purchase is made. According to the tape, no transaction occurred between the five-dollar purchase and the no-sale. Tucker opened the register at 6:22 a.m. at the direction of Captain Ledbetter to determine whether any money had been taken during the homicide. He concluded that approximately forty-eight dollars were missing.

On 16 November 1991 Lieutenant Mark Cherka and Officer David Lail drove to Anthony's Trailer Park to find defendant and bring him to the police station for questioning. Defendant came out of a trailer and allowed Cherka to take four photographs of him. Defendant agreed to accompany Cherka and Lail to the police station for questioning as a possible suspect in the murder. Defendant was not under arrest at that time; the officers told him he did not have to leave with them.

They arrived at the police station at approximately 4:00 p.m., and Cherka began to question defendant. Defendant refused to allow Cherka to tape record the interview, so Cherka made notes of what transpired shortly after the interview ended. Defendant stated that he had gone to sleep at around 4:00 a.m. on 31 October after drinking with Don Weathers and defendant's girlfriend, Lori Yelton. Later that morning Yelton and defendant took Weathers to the hospital because he had cut himself at some point during the previous night. Cherka left the interview room and related defendant's statement to Ledbetter. While Cherka had been questioning defendant, Truelove had identified defendant from a lineup containing thirty-two photographs as the man he saw in The Pantry on 31 October. Ledbetter informed Cherka of the identification and then accompanied Cherka back into the interview room.

Defendant again indicated he did not want to be tape recorded, and Ledbetter complied. Ledbetter told defendant about Truelove's identification and asked defendant if he wanted an attorney. Defendant stated that he had not killed anyone and did not want an attorney. Ledbetter advised defendant of his *Miranda* rights, and defendant signed a waiver of those rights. Defendant continued to deny involvement in the murder.

Ledbetter then told him he knew he had killed the woman and asked, "Why did you kill her?" Defendant hung his head and answered, "[S]he slapped me and I went off on her." Defendant then asked to speak to Ledbetter alone; Cherka left the room. Ledbetter again asked defendant why he had killed the victim. Defendant stated that she had slapped him, he had panicked, he had not intended to harm her, and he merely wanted the money from the cash register.

Defendant then indicated that he wanted to speak to Ledbetter off the record and asked Ledbetter to tear up the *Miranda* waiver form, which Ledbetter did. Defendant related additional details about the crime, including information about the weapon he had used, after Ledbetter ripped the form into four pieces. At about 6:00 p.m. defendant asked for a lawyer, and one was contacted for him. Defendant was arrested and taken into custody after he conferred with his lawyer.

Defendant testified that he did not read the *Miranda* waiver form, but signed it because he felt "agreeable" from cocaine he had ingested. He further testified that Ledbetter suggested they talk off the record. On cross-examination he admitted he had given *Miranda* warnings during his tenure in law enforcement; he recited the warnings on the witness stand. He also admitted he had not mentioned in his pretrial affidavit that Ledbetter proposed that they talk off the record.

Billy Joe Sparks testified that sometime after the murder he had a conversation with Paul Barnard, who called himself Rambo. During the conversation Rambo sniffed glue and both men drank beer. Rambo told Sparks he had killed a woman at a supermarket by beating her to death. Rambo died before defendant's trial; Sparks did not tell the police about Rambo's statement until after Rambo's death.

Johnny Smith, the operator of a local entertainment center, testified that he had spoken to Truelove about the murder. Smith stated that Truelove told him he had seen a man with red hair in The Pantry on the day of the murder.

In rebuttal the State recalled Truelove. He testified that he knew Rambo and that the lineup from which he identified defendant contained a photograph of Rambo. Truelove never picked Rambo as the person he saw at The Pantry on 31 October. Truelove also testified that he remembered having a conversation with Smith about becoming an uncle, not about the murder. Truelove and his sister both have red hair, and his sister had recently given birth to a baby with red hair.

The State also called Officer James Glover of the Shelby Police Department in rebuttal. Glover testified that Rambo claimed to be a Vietnam veteran and to have a black belt in karate; neither claim was true. Before his death Rambo had telephoned Glover and told him he had lied to Sparks about committing the murder. Rambo told Sparks he had killed a woman only to maintain his street image.

At sentencing the State relied on the evidence it presented at the guilt/innocence phase. Defendant's evidence showed that defendant was raised in a loving family, had worked as a jailer and with the fire department, and was well-liked and not violent. Dr. Terrence Onischenko, an expert in psychology and neuropsychology, testified that he performed comprehensive testing of defendant on 22 November 1992. The results showed that defendant's memory, problem-solving skills, and motor functions are impaired. Defendant scored in the average range on other tests. Dr. Onischenko also testified that defendant has an increased chance of developing Alzheimer's disease as well as other organic diseases. Defendant's abuse of cocaine and alcohol probably caused his brain dysfunctions. Defendant has an average IQ and normal concentration skills, language functions, sensory ability, and visual ability.

Defendant also presented evidence showing that he took good care of his son, who is profoundly mentally retarded and autistic. Defendant implemented the programs devised for his son's development and served on the advisory council of the parent-teacher organization at his son's school. Two jailers at the Cleveland County jail testified that defendant had adjusted well to life as an inmate and had caused no problems.

The jury found defendant guilty of first-degree murder under the felony murder rule, with robbery with a dangerous weapon as the underlying felony. At sentencing the jury found one aggravating circumstance, that the murder was committed for pecuniary gain, and no mitigating circumstances. It unanimously recommended that

defendant be sentenced to death; the trial court sentenced defendant accordingly.

PRETRIAL PHASE

[1] Defendant first assigns as error the trial court's denial of his pretrial motion to suppress the confession he made to Officer Ledbetter on 16 November 1991. He contends that any statements made after the destruction of his *Miranda* waiver form constitute an involuntary confession induced by the deception of a law enforcement officer. Thus, the trial court committed constitutional error by admitting those statements, in which defendant told Ledbetter, *inter alia*, what weapon he used, why he committed the crime, and how he disposed of the weapon.

Assuming *arguendo* that the trial court erred by admitting the statements defendant made after Ledbetter destroyed the waiver form, we hold that the error is harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (1988). Before defendant asked to speak off the record, he twice stated that he "went off on" the victim because she slapped him as he tried to rob the store. That voluntary confession, combined with Truelove's positive identification of defendant as the man in the store shortly before the crime and the other strong circumstantial evidence, makes any error in admitting the remainder of defendant's confession harmless beyond a reasonable doubt.

[2] Defendant next assigns as error the trial court's denial of his pretrial motion to suppress a telephone conversation and transcript thereof between himself, Don Weathers, and Lori Yelton that Weathers and Yelton tape recorded without defendant's knowledge or consent. The relevant facts are as follows: Defendant made several collect telephone calls to Weathers' home while incarcerated and awaiting trial for this murder. Yelton was also in jail at that time for an unrelated probation violation. On the day Yelton was released defendant called Weathers from prison and asked to speak to Yelton. Weathers told him Yelton was not there, even though she was, because Yelton did not wish to speak to defendant. Defendant called again later that day, Yelton agreed to talk to him, and Weathers recorded the conversation with Yelton's knowledge and consent by pushing the "record" button on his answering machine. Yelton gave the tape to the police shortly after the conversation occurred.

**STATE v. POWELL**

[340 N.C. 674 (1995)]

Weathers testified at the pretrial hearing that he recorded the conversation "for personal reasons." He and Yelton both testified that no police officer asked them to record any conversations with defendant, although they had been told that any information they had regarding the murder would help the police. Sergeant Mackey Linnens, who told Weathers he would appreciate any information Weathers had, testified that he did not ask anyone to record telephone conversations with defendant.

Defendant contends that Weathers and Yelton were acting as agents of the Shelby Police Department when they recorded the conversation. He further contends that admission of the recorded conversation and the transcript thereof violated his Fifth Amendment rights because the conversation constituted police-initiated questioning after defendant had requested and conferred with an attorney. Under the Fifth Amendment, police officers may not initiate questioning of an accused who has invoked the right to counsel. *State v. Pope*, 333 N.C. 106, 113, 423 S.E.2d 740, 744 (1992). Thus, if Weathers and Yelton recorded the conversation at the behest of the police, admitting the recording or a transcript thereof would be error. Even if no constitutional error occurred, defendant argues, the trial court should have excluded the evidence as unduly prejudicial under N.C.G.S. § 8C-1, Rule 403.

The trial court found that "there is no evidence that the recordation was done while the occupant of [Weathers'] premises was acting as the agent of the Cleveland County Police Department or any other law enforcement agency" and concluded that "the recordation is admissible into evidence." The record fully supports the trial court's findings of fact, which support the court's conclusion of law. The ruling did not violate defendant's rights under the Fifth Amendment. Further, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Thus, N.C.G.S. § 8C-1, Rule 403 does not preclude admission of the evidence. Accordingly, we overrule this assignment of error.

**[3]** Defendant next argues that the trial court erred by denying his pretrial motion to conduct *voir dire* inquiry regarding prospective jurors' beliefs about parole eligibility. Defendant concedes that this Court has decided this issue against his position but contends that *Simmons v. South Carolina*, — U.S. —, 129 L. Ed. 2d 133 (1994), requires reconsideration of our position. We rejected defendant's arguments in *State v. Price*, 337 N.C. 756, 762-63, 448 S.E.2d 827, 831

(1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 224, *reh'g denied*, —— U.S. ——, 131 L. Ed. 2d 879 (1995). Defendant presents no compelling reasons to depart from our precedent on this issue. This assignment of error is overruled.

JURY SELECTION

[4] Defendant argues that the trial court improperly precluded him from inquiring into four jurors' views about mitigating and aggravating circumstances in violation of *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992), and N.C.G.S. § 15A-1214. We disagree.

The trial court sustained the State's objection to the following question, which defendant asked during the group *voir dire* inquiry of four prospective jurors:

> Ladies and gentlemen, the judge is going to instruct you concerning your findings of aggravation and . . . of mitigation and you are to listen to the judge's instructions but if you have a doubt about whether the mitigating circumstances are outweighed by the aggravating circumstances, if the judge instructs you to that effect, do you understand that you may not vote to execute the defendant?

Defendant declined the trial court's invitation to rephrase the question but proceeded to ask four life-qualifying questions. Defendant exercised peremptory challenges to excuse two of the prospective jurors; the other two sat on the jury. Defendant argues that the trial court's ruling precluded him from inquiring into the prospective jurors' "feelings concerning the process by which the jury would impose capital punishment." Defendant also argues that the ruling influenced the jury to find none of the submitted mitigating circumstances.

Defendant has shown neither an abuse of discretion nor prejudice, both of which are required to establish reversible error relating to *voir dire. See State v. Miller*, 339 N.C. 663, 678, 455 S.E.2d 137, 145 (1995). A defendant may use *voir dire* as a vehicle for determining whether a prospective juror is "willing to consider a life sentence in the appropriate circumstances or would automatically vote for death upon conviction." *State v. Conner*, 335 N.C. 618, 644-45, 440 S.E.2d 826, 841 (1994). Defendant did not phrase the question at issue here, however, to elicit that information. Rather, the question related to the jurors' understanding of the weighing process used at sentencing hearings. The trial court properly could have concluded that it con-

fused the jurors because they had not yet been instructed on the sentencing procedure. Thus, the court did not abuse its discretion when it sustained the State's objection. Further, defendant asked the four prospective jurors several questions relating to whether they would automatically vote to impose the death penalty. Those questions allowed defendant to ascertain whether the prospective jurors could consider a life sentence. Defendant therefore was not prejudiced by the ruling.

Defendant has also failed to show a violation of N.C.G.S. § 15A-1214(c), which provides:

The prosecutor and the defense counsel, or the defendant if not represented by counsel, may personally question prospective jurors individually concerning their fitness and competency to serve as jurors in the case to determine whether there is a basis for a challenge for cause or whether to exercise a peremptory challenge. The prosecution or defense is not foreclosed from asking a question merely because the court has previously asked the same or similar question.

The trial court allowed both the prosecutor and defense counsel to "personally question prospective jurors." The statute does not eliminate the trial court's duty to supervise *voir dire* or its discretion in that regard. We conclude that the trial court's ruling was not an abuse of discretion, did not prejudice defendant, and did not violate N.C.G.S. § 15A-1214(c).

GUILT/INNOCENCE PHASE

[5] Defendant next argues that the trial court erred by admitting testimony regarding defendant's cocaine use and his receipt of AFDC and Social Security checks for the benefit of his son. He argues that the testimony was inadmissible character evidence and was unduly prejudicial. We disagree.

Lori Yelton testified over defendant's objection that she and defendant used about one gram of cocaine every day, at a daily cost of about one hundred dollars, when they lived together from April to October 1991. She also testified that during that time neither she nor defendant had jobs; monthly AFDC and Social Security checks defendant received for the support of his son represented their sole source of income. Finally, she testified that defendant stopped receiving both checks when his former wife took physical custody of the child in August 1991. The trial court ruled that the evidence was

admissible to show defendant's motive and that its probative value outweighed any prejudicial effect. The court instructed the jury that it could consider the testimony only for the purpose of showing a motive for the crime.

N.C.G.S. § 8C-1, Rule 404(b) allows the admission of evidence of other crimes, wrongs, or acts to show, *inter alia,* the defendant's motive. The trial court properly could have concluded that Yelton's testimony showed a motive for the crime at issue. Yelton stated that defendant had supported himself, Yelton, and their cocaine habit when defendant's only source of income was AFDC and Social Security checks. That evidence permits the inference that defendant needed money once the checks stopped in August 1991 and decided to commit this robbery to obtain that money. Further, defendant has not shown that the trial court abused its discretion when it concluded that the probative value of the evidence outweighed its prejudicial effect. An abuse of discretion occurs only where a trial court's ruling is neither supported by reason nor the result of a reasoned decision. *State v. Riddick,* 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986). We conclude that the evidence was properly admitted under both Rule 404(b) and Rule 403.

[6]  In a related assignment of error defendant argues that the trial court erred by admitting the testimony of Sue Ross, a social worker, over defendant's objection. Ross testified that defendant had received checks from government agencies for his son until two months before the murder. Defendant argues that this evidence tainted the jury's perception of his character and destroyed the mitigating value of his sentencing phase evidence, much of which focused on his loving care for his son. He thus argues that the testimony should have been excluded under Rule 401 as irrelevant and under Rule 403 as "wildly prejudicial."

We conclude that the trial court properly could find Ross's testimony relevant under Rules 401 and 404(b) to show motive. A defendant's motive is a fact of consequence to be considered, though the State is not required to prove it. *Riddick,* 315 N.C. at 758, 340 S.E.2d at 60. Further, defendant has not shown that the trial court abused its discretion when it determined that the probative value of Ross's testimony outweighed its prejudice to defendant. We will not reverse the trial court's ruling absent such a showing. *State v. Rose,* 335 N.C. 301, 319-20, 439 S.E.2d 518, 528 (1994). Accordingly, this assignment of error is overruled.

**[7]** Defendant next assigns as error the trial court's exclusion of character evidence offered by the defense through the testimony of defendant's former wife, Marjorie Collier. The State had shown that defendant's brother asked him to swear on their mother's grave that he did not commit the murder with which he was charged; defendant looked at him and, instead of swearing on his mother's grave, said, "I tried to borrow some money from you right before that happened, didn't I?" During the direct examination of Collier, defense counsel asked whether defendant "would ever swear on his mother's grave." The trial court conducted *voir dire* upon the State's objection to the question. Defendant made an offer of proof showing that Collier would testify that defendant loved his mother dearly and would never, in her opinion, swear on or profane his mother's grave. The trial court sustained the State's objection on the ground of hearsay. Defendant argues that the trial court erred because the proffered testimony was not hearsay but relevant character evidence admissible under N.C.G.S. § 8C-1, Rule 404(a)(1).

Rule 404(a)(1) provides that a defendant may offer character evidence as long as he tailors it "to a particular trait that is relevant to an issue in the case." *State v. Squire*, 321 N.C. 541, 546, 364 S.E.2d 354, 357 (1988). In the context of this rule, " 'pertinent' . . . is tantamount to relevant." *Id.* at 547, 364 S.E.2d at 358. Where evidence of a character trait is admissible, it may be introduced through testimony as to reputation or by testimony in the form of an opinion. N.C.G.S. § 8C-1, Rule 405(a) (1992).

Collier's testimony would have taken the form of an opinion; thus, if it illuminated a pertinent trait of defendant's character, it should have been admitted. We conclude that the proffered testimony did not constitute hearsay and would have revealed defendant's reverence and respect for his mother. That character trait was relevant in that the State's evidence raised the implication that defendant declined to swear to his innocence because he knew he was guilty. Evidence of defendant's respect for his mother was admissible under Rule 404(a)(1) to rebut this implication. Therefore, the trial court erred by excluding the testimony.

Defendant is entitled to a new trial, however, only if there is a reasonable possibility "that, had the error . . . not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a). Defendant has the burden of showing prejudice from any error. *See State v. McLaughlin*, 321 N.C. 267, 273, 362 S.E.2d 280,

**STATE v. POWELL**

[340 N.C. 674 (1995)]

284 (1987). We conclude that defendant has not met this burden. The evidence defendant sought to rebut through Collier's testimony did not constitute the heart of the State's case. Considering all of the other evidence, including the partial confession and eyewitness identification of defendant at the scene and near the time of the crime, Collier's testimony could not have affected the jury's verdict. This assignment of error is overruled.

[8]  Defendant next argues that the trial court erred by denying his motion for a mistrial made at the conclusion of the guilt phase and renewed after the sentencing phase. He contends his sentencing hearing was prejudiced by an outburst from persons in the courtroom when the foreman read the guilty verdict. Defendant argues that the trial court should have granted his motion "so that a different jury, untainted by the outburst, could [have heard] the sentencing [evidence]." We disagree.

A ruling on a motion for a mistrial lies within the discretion of the trial court. *State v. Bonney*, 329 N.C. 61, 73, 405 S.E.2d 145, 152 (1991). We will not overturn such a ruling absent a clear showing that the trial court abused its discretion. *Id.* Defendant has not made such a showing here. After the lunch recess following the close of the guilt phase, the trial court admonished the spectators that it would not "abide or suffer or allow anyone in this courtroom to engage in open conduct in the presence of this jury which would in any way disrupt the normal administration of justice." The court also informed the audience that any further outbursts would be punished as contempt of court. When the jury reassembled for the sentencing phase, the trial court instructed it in part as follows:

> Now, members of the jury, during the taking of the verdicts this morning there was an outburst in the courtroom that interrupted the proceedings for a very short period of time. I instruct you . . . that you should disabuse your mind from that outburst. You should not let it, in any way, enter into your consideration of any issues in this case. . . . [W]ith regards to this phase of the deliberations you should in no way, no way, allow any outbursts or exhibit of emotions . . . interfere with your cool, calm and dispassionate deliberation of the evidence in this case . . . .

The court also asked if any juror felt that he or she could no longer deliberate fairly and impartially as a result of the outburst; no juror indicated an inability to serve fairly.

**STATE v. POWELL**

[340 N.C. 674 (1995)]

From the foregoing we conclude that the trial court did not abuse its discretion by denying defendant's motion for a mistrial. The court took all steps necessary to ensure that the outburst would not affect the integrity of the sentencing proceeding.

### SENTENCING PHASE

**[9]** Defendant argues that the trial court erred by refusing to submit the statutory mitigating circumstance that "defendant has no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1) (Supp. 1994). He contends evidence presented at sentencing required the court to submit the circumstance for the jury's consideration.

A trial court is not required to submit a mitigating circumstance to the jury unless substantial evidence exists to support it. *State v. Skipper*, 337 N.C. 1, 44-45, 446 S.E.2d 252, 276 (1994), *cert. denied*, — U.S. —, 130 L. Ed. 2d 895 (1995). The record here does not contain substantial evidence regarding defendant's criminal past. The only such evidence consisted of testimony about defendant's cocaine use and a passing reference by a witness to the fact that defendant was temporarily released from jail to attend his father's funeral in the 1980s. The witness did not state the offense for which defendant was incarcerated or the length of his sentence. Neither party mentioned defendant's criminal record or introduced it into evidence. The trial court thus properly could determine that the evidence was insufficient to support the circumstance, and it did not err by declining to submit it.

**[10]** Defendant presents numerous assignments of error concerning the prosecutor's closing argument at sentencing. Defendant did not object to any of the allegedly improper statements at trial; he contends, however, that the trial court should have intervened *ex mero motu* and that its failure to do so constitutes prejudicial error. We disagree.

First, defendant argues that the prosecutor denigrated the entire sentencing process by telling jurors to focus on the crime instead of the mitigating evidence. The prosecutor also referred to some of the proffered mitigators as "lawyer talk" and, defendant posits, warned the jury that defendant's evidence at sentencing simply "muddied the waters" and removed the focus from the murder.

Second, defendant contends the prosecutor misstated the law when he discussed the proof in support of the statutory mitigating circumstance that defendant's capacity to appreciate the criminality of

his conduct was impaired at the time of the crime. *See* N.C.G.S. § 15A-2000(f)(6). For example, the prosecutor predicted that defense counsel would argue that defendant "didn't know what he was doing, that he didn't know that that was against the law to do something like [the murder]." Defendant argues that such comments denigrated his expert's testimony and urged an unduly restrictive interpretation of the law concerning the (f)(6) circumstance.

Third, defendant argues that the prosecutor improperly implied that one of defendant's nonstatutory mitigating circumstances had no value. The prosecutor mentioned the circumstance that "defendant has been a good prisoner while incarcerated in the Cleveland County Jail" and then said, "to which I respond, 'so what?' " Defendant submits that such commentary prejudiced him.

Finally, defendant contends the prosecutor argued facts not in evidence when he said that defendant killed the victim for forty-eight dollars and that defendant never said he was sorry in his confession or showed any remorse. Defendant argues that the record supports neither of those propositions.

Prosecutors are allowed "wide latitude in the scope of their argument." *State v. Zuniga*, 320 N.C. 233, 253, 357 S.E.2d 898, 911, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). A trial court must intervene absent objection only where the prosecutor's argument affects the right of the defendant to a fair trial. *Id.* Defendant did not object to any of the above statements at trial; we must therefore determine whether the arguments complained of were "so prejudicial and grossly improper as to require corrective action by the trial [court] *ex mero motu*." *State v. James*, 322 N.C. 320, 324, 367 S.E.2d 669, 672 (1988). In making that determination, we consider the statements in their context, not in a vacuum. *State v. Gibbs*, 335 N.C. 1, 64, 436 S.E.2d 321, 357 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 881 (1994).

We conclude that none of the prosecutor's statements contested by defendant were so grossly improper that the trial court should have intervened *ex mero motu*. The prosecutor did not denigrate the sentencing process but encouraged the jury to focus on the facts he believed justified imposition of the death penalty. Such encouragement is the job of a prosecutor in a criminal case. *Id.* at 64, 436 S.E.2d at 358. Additionally, the shorthand description of the (f)(6) mitigating circumstance did not unfairly mislead the jury, and the prosecutor argued facts fairly inferable from the State's evidence. In short, we

see nothing grossly improper in the prosecutor's closing argument. These assignments of error are overruled.

## PRESERVATION ISSUES

[11] Defendant contends the trial court's denial of his pretrial motion for individual *voir dire* violated his constitutional rights. He submits that group *voir dire* creates a "domino effect" whereby a prospective juror learns which answers will enable him or her to avoid jury duty. "This Court has specifically rejected defendant's argument that a potential 'domino effect' requires individual *voir dire* . . . ." *State v. Reese,* 319 N.C. 110, 119, 353 S.E.2d 352, 357 (1987); *see also Skipper,* 337 N.C. at 57, 446 S.E.2d at 284. Defendant presents no compelling reason to revisit this issue.

[12] Defendant next argues that the trial court should not have excused for cause four prospective jurors. Three stated they could not vote for the death penalty under any circumstances. The fourth told defense counsel he could consider only a sentence of life imprisonment. The record reveals that none of the four could have fulfilled the duty of jurors to set aside their personal beliefs and follow the law. The trial court thus properly excused them for cause. *See State v. Brogden,* 334 N.C. 39, 41-42, 430 S.E.2d 905, 907-08 (1993).

[13] Defendant next contends North Carolina's death penalty statute is unconstitutional, relying on Justice Blackmun's dissenting opinion in *Callins v. Collins,* — U.S. —, —, 127 L. Ed. 2d 435, 436 (1994). We have consistently rejected defendant's contention. *See, e.g., Skipper,* 337 N.C. at 58, 446 S.E.2d at 284; *State v. Roper,* 328 N.C. 337, 370, 402 S.E.2d 600, 619, *cert. denied,* 502 U.S. 902, 116 L. Ed. 2d 232 (1991).

[14] Defendant next argues that the trial court should have excluded the aggravating circumstance that the murder was committed for pecuniary gain and should have set aside the verdict when the jury found it. He contends the use of that circumstance violated the Eighth Amendment to the United States Constitution because his conviction rested solely on the felony murder rule, with robbery with a dangerous weapon as the underlying felony. We have rejected defendant's argument. *See, e.g., State v. Taylor,* 304 N.C. 249, 288-89, 283 S.E.2d 761, 785 (1981), *cert. denied,* 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied,* 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983). Defendant has presented no compelling reason to reconsider our position.

**[15]** Defendant next contends he is entitled to a new sentencing hearing because the trial court failed to give peremptory instructions on all the mitigating circumstances submitted. Defendant concedes he did not request such instructions. We have held that a trial court is not required to give peremptory instructions absent a request by the defendant. *State v. Gay*, 334 N.C. 467, 493, 434 S.E.2d 840, 855 (1993); *State v. Johnson*, 298 N.C. 47, 77, 257 S.E.2d 597, 619 (1979). We perceive no reason to reconsider that holding. This assignment of error is overruled.

**[16]** In his next assignment of error defendant argues that the trial court erred by instructing the jury that it could determine that a nonstatutory mitigating circumstance existed but had no mitigating value. He contends jurors must give weight to all mitigating circumstances found to exist, statutory and nonstatutory alike. We have rejected defendant's position on this issue. *See Miller*, 339 N.C. at 691, 455 S.E.2d at 152-53; *State v. Payne*, 337 N.C. 505, 533, 448 S.E.2d 93, 109-10 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 292 (1995). Defendant's argument does not warrant overruling our precedent.

**[17]** Defendant next argues that the trial court should have instructed the jury *ex mero motu* that the nonstatutory mitigating circumstance, "the defendant has been a good prisoner while incarcerated in the Cleveland County Jail," had mitigating value *per se*. We have held that "nonstatutory mitigating circumstances do not necessarily have mitigating value." *State v. Daniels*, 337 N.C. 243, 274, 446 S.E.2d 298, 317 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). This assignment of error is overruled.

**[18]** Defendant also argues that the trial court erred by instructing the jury that it had a "duty" to recommend a sentence of death if it found that the mitigating circumstances were insufficient to outweigh the aggravating circumstance and that the aggravating circumstance was sufficient to call for such a penalty. Defendant contends the instruction impaired the fair consideration of mitigating evidence in violation of *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978), and its progeny. We have consistently rejected defendant's argument. *See, e.g., Skipper*, 337 N.C. at 57, 446 S.E.2d at 283-84; *State v. McDougall*, 308 N.C. 1, 26, 301 S.E.2d 308, 323-24, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983). Defendant presents no new reason for us to reconsider our position.

PROPORTIONALITY REVIEW

**[19]** Having found no error in the guilt/innocence or sentencing phases, we must now fulfill our statutory duty to determine whether the record supports the aggravating circumstance found by the jury; whether the death sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor"; and whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). After a thorough review of the record, transcripts, and briefs, we conclude that the evidence supports the aggravating circumstance found, namely, that "[t]he capital felony was committed for pecuniary gain." N.C.G.S. § 15A-2000(e)(6). We further conclude that the sentence of death was not imposed "under the influence of passion, prejudice, or any other arbitrary factor." We thus turn to proportionality review, in which we compare this case with others "in the pool which are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

This case has two distinguishing characteristics: the severe brutality of the crime and the "complete lack of mitigating circumstances found by the jury." *Payne*, 337 N.C. at 537, 448 S.E.2d at 112. While the State did not submit the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, the evidence tended to show that this killing was particularly brutal. The victim had numerous lacerations on her face, with corresponding skull fractures underneath. Part of her left ear was torn off. Her nose was broken on the left side, and her left eye was displaced due to a fracture of the bone behind the eye. The victim also had lacerations on her forearm and hand, indicating that she struggled for her life. Further, she had internal injuries. For example, she had bone fragments embedded in her brain from the numerous fractures. Her brain was torn in some places and protruded from the skull in others. Finally, she had several bruises on her brain and a subdural hemorrhage. Defendant used a tire iron to inflict these injuries. The trial court submitted two statutory and sixteen nonstatutory mitigating circumstances. None of the jurors found any of these to exist, despite the uncontroverted evidence supporting some of the nonstatutory circumstances.

Further, this case is distinguishable from those in which this Court has found the death penalty disproportionate. In *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), the jury found several

mitigating circumstances, including that the defendant operated under a mental or emotional disturbance at the time of the crime. The jury here specifically rejected that circumstance. Further, the brutality of this crime substantially overshadows that of the crime in *Benson.* The defendant there shot the victim in the legs; defendant here beat out the victim's brains.

In *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987), the defendant was only seventeen years old at the time of the crime and acted with an older co-felon. Additionally, the evidence did not clearly establish whether defendant or his partner, who received a life sentence, acted as the ringleader. Here, by contrast, defendant killed alone and was forty-five years old at the time of the murder.

In *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988), the defendant tried to shoot a person with whom he had argued; he accidentally shot the victim instead. Defendant here brutally beat the defenseless victim to death without provocation.

In *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985), the defendant acted with accomplices and was only nineteen years old at the time of the crime. The jury "found evidence of one or more mitigating circumstances," *id.* at 674, 325 S.E.2d at 185, without specifying which circumstance(s) it found, *id.* at 690, 325 S.E.2d at 194. Again, defendant here acted alone and was forty-five years old. The jury found no mitigating circumstances.

In *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984), the defendant killed a law enforcement officer. The evidence did not clearly establish the circumstances of the crime, and the victim died shortly after the shooting. Here the facts surrounding the crime are much clearer, and the victim suffered a terrifying, torturous death.

In *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983), the defendant shot his victim but immediately obtained medical treatment for him. Defendant here left the victim to die in a pool of blood and never expressed remorse for his crime.

In *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983), the defendant shot the victim twice in the head. There was no evidence comparable to that of the brutal callousness with which defendant here beat the victim.

As we noted in *State v. Miller*, "[p]roportionality review is designed to 'eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " 339 N.C. at 692, 445 S.E.2d at 153 (quoting *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988)). It also guards against the imposition of the death penalty in an arbitrary or capricious manner. *Id.* Further,

> the issue of whether the death penalty [is] disproportionate in a particular case ultimately rest[s] upon the "experienced judgments" of the members of this Court. . . . [T]he fact that one, two or several juries have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have "consistently" returned life sentences in factually similar cases.

*State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, — U.S. —, 130 L. Ed. 2d 547 (1994). A jury is likely to recommend a sentence of death for a defendant who commits a murder "in a particularly egregious manner." *State v. Harris*, 338 N.C. 129, 162, 449 S.E.2d 371, 387 (1994), *cert. denied*, — U.S. —, 131 L. Ed. 2d 752 (1995). The murder here was so committed. We thus cannot conclude that the death sentence was aberrant, capricious, or disproportionate.

NO ERROR.