**William Dillard POWELL, Petitioner,**

v.

**R.C. LEE, Warden, Central Prison, Raleigh, North Carolina; and Roy A. Cooper, III, Attorney General of North Carolina, Respondents.**

**No. CIV. 102CV293.**

United States District Court,
W.D. North Carolina,
Asheville Division.

Sept. 11, 2003.

Ann. § 27–503(d).

James R. Glover, Glover & Petersen, P.A., Chapel Hill, NC, for Petitioner.

Valerie B. Spalding, N.C. Dept. of Justice, Raleigh, NC, for Respondents.

### *MEMORANDUM OF OPINION*

THORNBURG, District Judge.

THIS MATTER is before the Court on the Petitioner's petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Respondents have filed both a motion for summary judgment and a response to the petition. The parties have submitted portions of the record for review as well as legal briefs. The undersigned concludes the record is adequate and finds an evidentiary hearing is unnecessary. Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts. For the reasons stated herein, the petition is denied.

### I. PROCEDURAL BACKGROUND

On April 29, 1993, the sentence of death was imposed on the Petitioner by the same jury that two days earlier had found him guilty of first degree murder under the felony murder rule. On direct appeal, the North Carolina Supreme Court concluded "that defendant received a fair trial, free of prejudicial error, and that the sentence of death is not disproportionate." *State v. Powell*, 340 N.C. 674, 682, 459 S.E.2d 219, 222 (1995). Petitioner's petition for a writ of *certiorari* to the United States Supreme Court was denied in January 1996. *Powell v. North Carolina*, 516 U.S. 1060, 116 S.Ct. 739, 133 L.Ed.2d 688 (1996).

On April 22, 1997, the Petitioner filed a motion for appropriate relief (MAR). During that proceeding, litigation occurred concerning discovery from the State and the scope thereof. In June 1997, the Petitioner's motion for discovery was denied and an order was entered summarily deny-

ing the MAR. On September 30, 1997, the North Carolina Supreme Court temporarily stayed the Petitioner's execution date and the dismissal of his MAR. On July 29, 1998, the state Supreme Court granted the petition for writs of *certiorari* and *supersedeas* for the limited purpose of remanding the case for reconsideration of the MAR. *State v. Powell,* 348 N.C. 697, 511 S.E.2d 654 (1998). The State's response to this remand was a request for a ruling without an evidentiary hearing and summary dismissal. On October 15, 1998, that motion was granted and the Petitioner moved to vacate the dismissal. On July 1, 1999, the state court vacated the October 1998 order of dismissal and found the Petitioner was entitled to an evidentiary hearing. The State's petition to the North Carolina Supreme Court for a writ of *certiorari* was denied in October 1999. *State v. Powell,* 540 S.E.2d 745 (N.C.1999).

Discovery hearings were conducted in February, March and April of 2000. On March 27, 2000, the Petitioner amended his MAR and an evidentiary hearing was conducted in June 2000. On June 27, 2001, both the MAR and amended MAR were denied. Petitioner's petition for a writ of *certiorari* was denied by the State Supreme Court on December 19, 2002. *State v. Powell,* 356 N.C. 621, 575 S.E.2d 520 (2002). This action was filed three days later.

## II. STATEMENT OF FACTS AT TRIAL

Mary Gladden was the evening shift clerk at The Pantry on Charles Road, Shelby, North Carolina, on October 31, 1991. *Powell,* 340 N.C. at 682, 459 S.E.2d at 222. Scott Truelove (Truelove) purchased gasoline from the store around 3:15 a.m. that morning. *Id.* While paying at the counter, he stood near "a rough-looking man with unkempt, shoulder-length

hair, facial hair, and a tattoo on his left forearm." *Id.* That same morning, Clarissa Epps stopped to buy gasoline from the store around 4:15 a.m. *Id.* After waiting to pay inside the store, she called out but no one answered. *Id.* Epps then saw the victim lying behind the counter. *Id.* Epps drove home and called the police. *Id.*

The investigating officer found the victim lying on her back "in a pool of blood" with injuries to head and left eye and ear. *Id.* An autopsy revealed that her skull had been fractured in several places, her nose was broken, and her left eye had been displaced by a fracture to the bone behind it. *Id.* Death had been caused by blunt trauma and she died from that trauma before she lost a fatal amount of blood. *Id.*

On November 16, 1991, the Petitioner voluntarily accompanied officers to the police station for questioning despite being told he was not under arrest and did not have to go with them. *Id.,* at 683, 459 S.E.2d at 223. The Petitioner signed a *Miranda*[1] waiver during the interview. When the interviewing officer asked, "Why did you kill her?," the "Defendant hung his head and answered, '[S]he slapped me and I went off on her.'" *Id.,* at 684, 459 S.E.2d at 223. Petitioner also stated that he had not intended to hurt her; he had only come in to rob the store. *Id.*

Don Weathers (Weathers) testified that on the evening before the victim was murdered, he, the Petitioner and the Petitioner's girlfriend, Lori Yelton (Yelton), were at his apartment and had been drinking "quite a bit." Respondents' Exhibit B4, at 1328. Sometime after midnight, he was cut with a knife so badly that he had to have stitches. *Id.*

Yelton testified that she began living with the Petitioner in April 1991. *Id.,* at

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

1395. At that time, and throughout the time she lived with the Petitioner, Yelton used a gram of cocaine each day. *Id.*, at 1397. However, neither she nor the Petitioner worked during this time and the Petitioner's only source of income was disability income received on behalf of his son. *Id.*, at 1402. This income stopped in August 1991 when the child began living with his mother. *Id.* In September and October 1991, the electricity in Petitioner's apartment was disconnected due to non-payment and Yelton and the Petitioner would often stay at Weathers' apartment. *Id.*, at 1403. During this time period, Yelton and the Petitioner used cocaine together every day. *Id.*, at 1405. On the evening of October 30, 1991, she and the Petitioner used cocaine all day until about 9:00 or 10:00 p.m. when they exhausted their supply, *Id.*, at 1407.

During the sentencing phase of the trial, defense counsel presented the testimony of Dr. Terrence Onischenko, an expert in psychology and neuropsychology, who opined that the Petitioner's abuse of cocaine and alcohol had caused organic brain dysfunction. *Powell,* 340 N.C. at 685, 459 S.E.2d at 224; Respondents' Exhibit B5, at 1773, 1776. Dr. Onischenko also testified that Petitioner's history of cocaine and alcohol abuse could "impair judgment, reasoning and logic[.]" *Id.*, at 1776. "He has a brain dysfunction and in combination with any kind o[f] alcohol or substance abuse, the tendency is for these people to be more confused, impaired and dysfunctional." *Id.*, at 1777. He testified that the Petitioner was within the normal range on some of the tests that evaluated elements of judgment and reasoning; however, in other areas of neuropsychological skills, he was grossly impaired. *Id.*, at 1786. When asked how long the Petitioner had experienced this condition, the doctor responded that although it was "hard to say," it was something which had chronically developed; "it's not something that happened overnight or recently." *Id.*, at 1787. Evidence was also presented that the Petitioner had been a good care-giver to his profoundly retarded and autistic son. *Powell,* 340 N.C. at 685, 459 S.E.2d at 224. Despite this evidence, the jury found no mitigating factors and concluded the murder had been committed for pecuniary gain. *Id.*

A witness named Billy Joe Sparks testified "that sometime after the murder he had a conversation with Paul Barnard, who called himself Rambo." *Id.*, at 684, 459 S.E.2d at 223. While the two men drank, Rambo "told Sparks he had killed a woman at a supermarket by beating her to death." *Id.* Rambo died before the Petitioner's trial. *Id.* Officer James Glover of the Shelby Police Department testified on rebuttal that Rambo was known for fabricating a story that he was a Vietnam veteran with a black belt in karate. *Id.*, at 685, 459 S.E.2d at 224. The officer further testified that Rambo had called him prior to his death and admitted that he "had lied to Sparks about committing the murder [in order] to maintain his street image." *Id.*

Commander Dale Ledbetter (Ledbetter) of the Shelby Police Department testified during the Petitioner's trial. On November 3, 1991, he prepared a photographic line-up at the police station which was admitted into evidence at trial as State's Exhibit 2.[2] Respondents' Exhibit B4, at 1154. The photograph placed in position number 3 was of Michael Bailey, a man who had been corresponding with the deceased victim by mail. *Id.*, at 1155. The purpose of the photographic array, which

---

2. Ledbetter testified that Exhibit 2 appeared exactly as it had on the date that Truelove saw it except that the photograph in slot number 3 had been removed after Truelove's inspection. *Id.*, at 1155.

was shown to Truelove, was to eliminate Bailey as a suspect. *Id.* Truelove saw the array, which did not contain the Petitioner's photograph, at about 3:00 p.m., on November 3, 1991, and he did not make any identification. *Id.,* at 1155–56. Because Bailey was in custody in another state and had not been identified by Truelove, his photograph in slot number 3 was removed.

On November 16, 1991, Ledbetter asked Truelove to view another photographic array which was introduced at trial as State's Exhibit 3. *Id.,* at 1156. This array contained 32 photographs, including that of the Petitioner which was in slot number 14. *Id.* The positions of each of the photographs in Exhibit 3 as admitted at trial were exactly the same as on the day that Truelove saw the array. *Id.,* at 1157. Truelove pointed to number 14 and stated that it was that person who looked the most like the person in The Pantry on the evening of the murder. *Id.* Another officer asked if Truelove was sure and he replied, "I'm 100% sure that's the man that was in The Pantry that night that I purchased gas." *Id.,* at 1158. Truelove did state that some of the individuals in the array had similarities to the person he had seen in the store. *Id.,* at 1166. Weathers was among the individuals whose photographs were in the array. *Id.,* at 1164.

In addition to the November 3 and 16, 1991, line-ups, Truelove was shown a third array on November 2, 1991. *Id.,* at 1165, 1250. That array, which was compiled by Officer Larry Linnens, contained eight photographs including one of the Petitioner which had been taken in 1977. *Id.,* at 1250–51. When shown the array, Truelove stated that no one in any of the photographs looked like the man he had seen in the store. *Id.,* 1253.

During the pretrial proceedings, Petitioner's defense attorneys were shown the November 16, 1991, line-up at the police station. *Id.,* at 1182–83. By mistake, the line-up shown to defense counsel contained both photographs of the Petitioner; however, the line-up actually identified by Truelove contained only the photograph taken of the Petitioner on November 16, 1991, at his trailer park before he accompanied the officers to the police station. *Id.,* at 1183.

During the trial, Truelove made an in-court identification of the Petitioner. *Id.,* at 1269. He also reviewed State's Exhibit 3 and testified that the photograph in slot number 14 was the photograph which he identified on November 16, 1991, as the Petitioner. *Id.,* at 1274–75. Truelove testified that it did not take him any time to recognize the Petitioner and he told the officers that he was "100% sure that was the man I s[aw] in The Pantry that night." *Id.,* at 1276–77. Truelove also testified that the man he saw that night had a tattoo on his left forearm. *Id.,* at 1312–13. The Petitioner had a tattoo on his left forearm. *Id.,* at 1314.

Commander Ledbetter also testified during a suppression hearing held in April 1993 prior to the trial. He spoke to the Petitioner on November 16, 1991, around 5:00 p.m., after the Petitioner accompanied other officers to the police station. Respondents' Exhibit A1, at 90, 92. Before he began speaking with the Petitioner, Ledbetter had learned that Truelove had identified the Petitioner from a photographic array. *Id.,* at 95. Ledbetter told the Petitioner that he had been identified as being at the store around the time of the murder and that as a result, he "needed to advise him of his constitutional rights." *Id.,* at 97. The Petitioner volunteered that he had not killed anyone. *Id.* Ledbetter began reading the *Miranda* rights to the Petitioner. *Id.* After reading it to the Petitioner, Ledbetter slid it to-

ward the Petitioner and he signed it, although Ledbetter struck out the word "accused" and left the word "suspect" open. *Id.*, at 99. Lieutenant Cherka witnessed the signatures. *Id.*, at 100. At that time, Ledbetter said, "Bugs[3], I know you killed this woman. Why did you do it? That's all I want to know is why? He dropped his head, mumbled a few words, looked up at me and sa[id], "I slapped her. She slapped me, and I went off on her." *Id.*, at 101–02 (footnote added). After making this statement, the Petitioner said he wanted to go off the record and asked if he could speak with Ledbetter alone. *Id.*, 102–03. The Petitioner then said that "Ms. Gladden slapped him; that he panicked and just wanted to get out of there and he did not intend to hurt the lady; all he wanted was the money." *Id.* Cherka then left. *Id.*, at 102. The Petitioner then asked Ledbetter to tear up the *Miranda* warning and he did so. *Id.*, at 104.

> Mr. Powell indicated that he had taken Mr. Weathers' truck and had driven it down to The Pantry for the purpose of getting money; that he went inside The Pantry. He remembers a person coming in there; he does not know the person's name nor what he looks like, but he does remember a person coming in there while he was there purchasing gas. That he went behind the counter in an attempt to get the money and the lady fought him over the money. The he picked up something from behind the counter and began to hit this lady. [A]ll he wanted to do was get out of there but she kept holding on with him and he panicked and just went off on her.

*Id.*, at 104–05. The Petitioner then told him where he had thrown the murder weapon on his way back to Weathers' apartment. *Id.* "Right at the last is when he said, 'Do you think I need an attorney?' I said, 'I think you do.'" *Id.*, at 106.

Ledbetter testified repeatedly that the Petitioner was sober during the interview, understood the questions and knew what he was doing.

## III. STATEMENT OF FACTS AT THE MAR HEARING

Dr. Onischenko also testified at the hearing on the Petitioner's motion for appropriate relief (MAR). Respondents' Exhibit KK1, at 10–80. In his opinion, at the time the capital felony was committed, the Petitioner had a pattern of neuropsychological dysfunction caused by alcohol and cocaine abuse. *Id.*, at 46–47. He also testified that *if, in fact,* the Petitioner had been abusing those substances on the day of the crime, he would be more prone to act impulsively and angrily. *Id.*, at 51–52. In addition, the Petitioner's ability to appreciate the criminality of his conduct and to conform his conduct would have been impaired. *Id.*, at 55–56. Nonetheless, Dr. Onischenko had told defense counsel during the trial that he "was not in any position to make a comment about this individual on that day of a conduct of the alleged criminal act and what his mental status [was] at that time. Obviously, it would depend on a lot of factors including how much alcohol and/or cocaine was consumed, et cetera." *Id.*, at 50.

Dr. Roy Matthew, a psychiatrist with a specialty in addiction, performed an evaluation of the Petitioner in connection with the MAR. *Id.*, at 101. At the time of the offense, the Petitioner had an addiction to multiple drugs and was, in Dr. Matthew's opinion, on a cocaine binge. *Id.*, at 104. The crime occurred at the end of a three-day cocaine binge during which the Petitioner had been taking cocaine intravenously. *Id.*, at 106. When a person is on such a binge, he can only focus on obtaining more cocaine. *Id.*, at 110. Cocaine

---

**3.** This was apparently a nickname for the Petitioner.

makes an abuser very irritated, suspicious, and paranoid. *Id.*, at 111. This situation was worsened by the fact that the Petitioner was also a Xanax abuser and had taken two milligrams of Xanax before the crime occurred. *Id.*, at 112. Xanax removes a person's normal inhibitions. *Id.*

Ali Paksoy, one of the Petitioner's trial attorneys, testified at the MAR hearing that, although he could not specifically recall, he may not have asked Dr. Onischenko about mitigating factors by using the statutory language. *Id.*, at 80, 193–94. It was, however, his recollection that he requested the submission to the jury of those mitigating factors. *Id.* In addition to his trial testimony, Dr. Onischenko had been retained to testify at the suppression hearing

> to show the effects of cocaine abuse and alcohol abuse on his ability to make an intelligent, understandingly voluntary statement to police and how it would affect that. We also wanted to present evidence of his cocaine addiction or cocaine use and how it affected his mental capacity[,] his capacity to appreciate what he did and his condition at the time and his mental or emotional disturbance. We felt all along and as part of our strategy that "Bugs"—throughout his life[,] we had no indication that he had ever been a violent person until he got mixed up with cocaine and with this Lori Yelton. And we felt he made a very bad, serious mistake but he wasn't a bad person and we wanted to show, we wanted to show the cocaine use; we wanted to show his life history up to the point of having been a police officer and all the good he had done, especially for his handicapped child. And this mistake, although bad, shouldn't lead to his death but to life in prison. And we wanted to show his cocaine use but we really wanted to avoid showing that he had voluntarily used cocaine over a nine month period and show that, I think Dr. Onis-

chenko's testimony was that it would tend to make him violent. And we kind of wanted to stay away from that in front of the jury. We didn't really feel how the voluntary use of cocaine and alcohol over this period would be seen. We wanted to show how it affected his mental state. But I did[ ] want to stay away from the violent aspect of it and focus on his life and all the good he had done.

*Id.*, at 196–97.

The Petitioner's second trial counsel, Ralph Gilbert, also testified at the MAR hearing that, "We were dancing around the issue of [the Petitioner's] cocaine—his voluntary cocaine use and the—as we understood it, his propensity, when he was using cocaine, to be violent." Respondents' Exhibit KK2, at 312.

Mr. Paksoy also testified during the MAR hearing about the discovery process prior to the Petitioner's trial. His first discovery request was submitted to the State in December 1991. Paksoy received and reviewed tape-recorded interviews with Truelove who identified the Petitioner as the individual in the store just prior to the murder. Respondents' Exhibit KK1, at 141. Police reports from interviews with Truelove were received although Paksoy was not sure if he ever received copies of the police notes. *Id.*, at 143. He did not recall receiving a list of suspects from the State. *Id.*, at 141–42. Defense counsel was allowed to view the photographic array shown to Truelove during his identification of the Petitioner; however, at trial, counsel learned that another array existed. *Id.*

In December 1992, defense counsel served another discovery motion requesting the court to compel the State to provide access to the open file and comply with *Brady. Id.*, at 144. During the hearing on that motion, the prosecutor agreed

to show counsel the photographic arrays in their original form and to provide *Brady* material. *Id.*, at 145. In February 1993, defense counsel were shown two different photo line-ups which had been shown to Truelove and were allowed to have their own photographer make a copy of them. *Id.*, at 146–47. Counsel assumed that the arrays were in the same form as they had been when shown to Truelove because that was the request contained in the discovery motions. *Id.*, at 153–54. Each array contained a picture of the Petitioner. *Id.*, at 151. One array contained a picture of the Petitioner at Anthony's Trailer Park without a shirt on and the other array appeared to contain a mug shot of the Petitioner taken in 1977. *Id.*, at 152–53. Counsel subsequently moved to suppress the identifications made by Truelove. *Id.*, at 150.

Defense counsel's recollection was that during the suppression hearing Truelove only identified the Petitioner as a suspect. *Id.*, at 154–55. Mr. Paksoy's file showed that he received discovery concerning an interview of Truelove on October 31, 1991, and November 6, 1991. *Id.*, at 156. He was not aware that an interview also occurred on November 3, 1991. *Id.* In that array, there was one photograph missing in slot number 3 which apparently was removed because the authorities knew the man in that photograph had an alibi. *Id.*, at 158, 164. During that interview, Truelove stated that the individual in slot number 2 had similarities to the man he saw in the store on the evening of the murder. *Id.*, at 159. The first time defense counsel learned of this was during the suppression hearing. *Id.*, at 165. During the MAR hearing, there was some question as to whether the photograph of the individual which Truelove testified was similar was in slot number 2 or 3, which was missing by the time defense counsel saw the array. In other words, MAR counsel attempted to show that Truelove had stated that two

individuals other than the Petitioner looked similar to the individual he saw in the store on the evening of the crime. Counsel testified that this information would have been useful in the defense. *Id.*, at 170.

During the hearing on Petitioner's MAR, counsel produced a photograph of Randy Bowman which was found in the police files. *Id.*, at 185. A "stickie" note had been placed on the photograph with a handwritten notation "picked by Scott Truelove." *Id.* Trial counsel had not seen that photograph before the hearing. *Id.*

On cross-examination during the MAR hearing, Paksoy clarified that the police did in fact provide him access to its files, known as the "police box," and that it contained photographs and a list of suspects. *Id.*, at 202–03. Counsel also acknowledged that under North Carolina law, the State is not obligated to provide a list of witnesses to the defense and that *Brady* is not violated if exculpatory evidence is produced, *albeit* at trial, but nonetheless in time for the defense to make use thereof. *Id.*, at 204–05. Counsel also acknowledged that during the suppression hearing, he learned about the November 2, 1991, photographic array shown to Truelove which contained the 1977 "mug shot" of the Petitioner. *Id.* Truelove did not identify the Petitioner from that array. *Id.* It was also clarified that the November 16, 1991, array contained the photograph of Michael Bailey, the New Jersey inmate, which had been removed from the November 3, 1991, array. *Id.*, at 207–08. The November 16, 1991, array contained one photograph of the Petitioner, the photograph taken on November 16, 1991. *Id.*, at 252.

Commander Ledbetter testified during the MAR hearing that he and his officers prepared a document captioned "Suspects Called In or Otherwise Submitted to the

Shelby Police Department During the Early Stages of the Investigation into the Mary Ann Gladden Case," which contained the names of 83 suspects. Respondents' Exhibit KK2, at 270–71. He personally placed everything in his investigative file on a table at the police station for defense counsel, "which included the Suspects List." *Id.* He also had copies made of every tape-recorded interview for defense counsel. *Id.*, at 268. "Everything that we had up until November the 16th that was placed in that file was made accessible to Mr. Gilbert and Mr. Paksoy." *Id.*, at 271–72. Also contained within the police master file was a photograph of Randy Bowen on the back of which was a piece of paper containing Ledbetter's handwritten notation "Picked by Truelove." *Id.*, at 277. On October 31 or November 1, 1991, Truelove was asked to come to the police station to review mug shots of individuals having similar characteristics to the individual described by Truelove. *Id.*, at 278. Truelove picked out seven or eight photographs which Ledbetter put in a stack marked "Picked by Truelove." *Id.* All of those photographs were in the file. *Id.* Ledbetter identified seven photographs taken from the master file of the men selected by Truelove on October 31 or November 1, 1991, as individuals having similar characteristics to the man he saw in the store. *Id.*, at 330–35. This presentation to Truelove was not a line-up but merely to begin to understand what physical characteristics the suspect possessed. *Id.*, at 341.

Gilbert's recollection was in accord with Ledbetter's. *Id.*, at 315. Ledbetter had placed photographs on the table but also had a cardboard box containing evidence and documents to which he and co-counsel had "unfettered" access. *Id.* The photographs included individual photographs, not just line-up arrays. *Id.*, at 324. "[W]e continued to hammer away on discovery because we wanted to make sure that we got everything. But I never got the feeling that the DA was stonewalling anymore than usual." *Id.*, at 320. It was also possible that he and co-counsel saw something in the police file which they did not copy. *Id.*, at 321. Gilbert also opined, "If there was ever a bad time to try a capital case in Cleveland County, it was that time. The trial had fallen on the heels of those two capital murders and they were very notorious capital cases." *Id.*, at 322–23. In addition, although the District Attorney's office did not want the police to be cooperative with defense counsel or speak with them, Gilbert recalled that the police were cooperative and in fact were disciplined for doing so. *Id.*, at 329.

Officer Larry Lennins (Lennins) also testified at the MAR hearing. Michael Bailey was eliminated as a suspect because at the time of the crime he was imprisoned in Indiana. *Id.*, at 401. Thirteen individuals were eliminated as suspects although Lennins could not recall the reasons why as to each individual. *Id.*, at 405. Lennins had a list containing the names of these individuals which he considered to be only his personal notes, not an official list of eliminated suspects. *Id.* As far as he was aware, there was no such document as an official list of eliminated suspects. *Id.*, at 406. After the Petitioner confessed to the murder at the police station on November 16, 1991, and his confession had been corroborated by Truelove's identification and the interviews of Weathers and Yelton, Lennins stopped any follow-up on other potential suspects. *Id.*, at 409–10.

Officer Preston Cherka testified that he was present when the Petitioner's attorneys sent their photographer to the police station to photograph the array presented to Truelove on November 16, 1991, and from which he identified the Petitioner. *Id.*, at 428–49. The photographer told him that he could not photograph the pictures

against the corkboard background on which they had been secured with thumbtacks. *Id.* As a result, the photographer removed the pictures and placed them against a white background and then photographed them. *Id.* The placement of the pictures against the white background was made by the photographer, not the police. *Id.*

In fact, the photographer transferred the pictures back to the corkboard after the photograph; however, he placed them out of order. *Id.*, at 439. As a result, Ledbetter put them back in the proper order. *Id.* Prior to the photographer's visit, defense counsel had seen the array several times. *Id.*

The master file also contained the handwritten notes of officers investigating the case. *Id.*, at 443. The box also contained photographs of trucks matching the description given by Truelove. *Id.*, at 443–45. One suspect, Eugene Hastings, owned such a truck but was in prison at the time of the murder. *Id.* Phillip Self was a suspect because he resembled the description given by Truelove; however, he was in the hospital for abdominal surgery just before the murder and was unable to commit such a crime. *Id.* Other suspects were eliminated because, although their photographs were included in the arrays, Truelove did not identify them in any array. *Id.*, at 445–56. Among those suspects were the victim's two sons. *Id.* In addition, there were eleven suspects who resembled the composite prepared from Truelove's description whose photographs were never shown to the Truelove but who were eliminated from investigation after the Petitioner's confession and arrest. *Id.*, at 445–467, 479.

The first break in the case came when Weathers telephoned the police and reported that he had been with the Petitioner on the evening before the murder and later recalled hearing the Petitioner confess to Yelton. *Id.*, at 471. When the Petitioner came in for questioning, he confessed to Ledbetter and described where the murder weapon was. *Id.*, at 475. Although the District Attorney advised Ledbetter not to cooperate with defense counsel, he did anyway because that was how he had conducted himself for the past 25 years. *Id.*, at 479–80. All of the evidence was in the master file or box, labeled by the investigators' names and categories. *Id.*, at 481. Ledbetter answered their questions and specifically recalled that the attorneys looked in the box. *Id.*, at 482.

## IV. STANDARD OF REVIEW

Title 28 of the United States Code, § 2254 provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As recently as August of this year, the Supreme Court has interpreted this language.

> The amendments to 28 U.S.C. § 2254 ... circumscribe our consideration of [Petitioner's] claim and require us to limit our analysis to the law as it was "clearly established" by our precedents at the time of the state court's decision.... We have made clear that the

"unreasonable application" prong of § 2254(d)(1) permits a federal habeas court to "grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts" of petitioner's case. In other words, a federal court may grant relief when a state court has misapplied a "governing legal principle" to "a set of facts different from those of the case in which the principle was announced." In order for a federal court to find a state court's application of our precedent "unreasonable," the state court's decision must have been more than incorrect or erroneous. The state court's application must have been "objectively unreasonable."

*Wiggins v. Smith,* —— U.S. ——, —— ——, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 407, 409, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)) (other citations omitted).

## V. DISCUSSION

### A. The claim that Petitioner received ineffective assistance of counsel because trial counsel failed to present evidence at the sentencing phase of trial that would have established statutory mitigating factors.

■ Petitioner claims that his trial counsel improperly phrased the questions to his expert psychologist during the sentencing hearing, should have obtained additional expert testimony, and should have requested a peremptory instruction on mitigating factors. Each of these issues was presented to and adjudicated by the state court. Respondents' Exhibit QQ.

The Supreme Court has stated the test for determining whether a defendant received adequate assistance of counsel.

First, the defendant must show that counsel's performance was deficient.

This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Unless a defendant makes both showings, his claim of ineffective assistance of counsel must fail. *Id.* Thus, a defendant must show counsel's performance fell below objective standards of reasonableness, and, that but for his conduct, there was a reasonable probability the result of the trial would have been different. *Id.,* at 688, 104 S.Ct. 2052.

However,

[u]nder § 2254(d)'s "unreasonable application" clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied *Strickland* incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. An "*unreasonable* application of federal law is different from an *incorrect* application of federal law." [The reviewing court may not] ultimately substitute[ ] its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d).

\* \* \* \* \* \*

"[I]t is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." The federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-

court intervention only when a state-court decision is objectively unreasonable. . . . Whether or not [this Court] would reach the same conclusion as the [North Carolina] Supreme Court, . . . "at the very least . . . the state court's contrary assessment was not 'unreasonable.'"

*Woodford v. Visciotti,* 537 U.S. 19, 24–25, 27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2003) (quoting *Williams, supra,* at 410, 120 S.Ct. 1495 and *Bell v. Cone,* 535 U.S. 685, 699, 701, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)) (other citations omitted).

In questioning Dr. Onischenko, trial counsel did not use the specific statutory language of N.C. Gen.Stat. § 15A–2000(f)(2), that is, was the capital felony committed while the Petitioner was under the influence of a mental or emotional disturbance and N.C. Gen.Stat. § 15A–2000(f)(6), that is, was the Petitioner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law impaired. The state court noted that Dr. Onischenko could not opine with certainty the degree of Petitioner's impairment at the time of the murder. The court also found that the evidence about the brutal nature of the murder insured there was no reasonable probability that one or more of the jurors would have found that mitigating factors outweighed the aggravating factors and that a sentence of life imprisonment was warranted.

During the sentencing phase of the trial, Dr. Onischenko testified that, at the time he evaluated the Petitioner, the Petitioner suffered from an organic brain dysfunction caused by the chronic abuse of cocaine and alcohol. This dysfunction, which had developed over a long period of time, could impair judgment, reasoning, and logic. Before the trial, Dr. Onischenko had advised trial counsel that he could not form an opinion or testify to the Petitioner's

exact state of mind or condition on the date of the murder. As a result, counsel could not question the doctor by the use of the exact language in the statutory mitigating factors, namely, at the time of the murder, was the Petitioner under the influence of a mental or emotional disturbance; and at the time of the murder, was the Petitioner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law impaired. Indeed, to have posed such questions in view of the expert's prior warning would have been both unethical and incompetent in view of the response which most certainly would have been elicited. "To be reasonably effective, counsel was not required to second-guess the contents of [the expert's opinion]." *Wilson v. Greene,* 155 F.3d 396, 403 (4th Cir.1998).

Nonetheless, the questions posed, and the answers elicited, were more than sufficient to place these two factors before the jury. *Woodford,* 537 U.S. at 24–25, 123 S.Ct. 357; *Fisher v. Lee,* 215 F.3d 438, 452 (4th Cir.2000), *cert. denied,* 531 U.S. 1095, 121 S.Ct. 822, 148 L.Ed.2d 706 (2001) ("[T]he testimony that Dr. Hoover gave during the guilt phase was clearly competent and more than sufficient to allow for the submission of the . . . (f)(2) and (f)(6) mitigating circumstances to the jury."). Moreover, testimony presented during the guilt phase of the trial from Petitioner's companions on the evening of the murder clearly established the use of both cocaine and alcohol in the hours preceding the crime. Thus, evidence of the Petitioner's impairment on that evening was before the jury.

██ Petitioner's trial counsel testified during the MAR hearing that he and co-counsel made a decision not to over emphasize the Petitioner's cocaine and alcohol abuse during the nine months preceding the murder because they were unsure how

a jury in the conservative area of Cleveland County would receive evidence of habitual substance abuse.[4]

> In any event, emphasizing intoxication [and drug abuse] at the time of [the] murder, or a history of drinking [and cocaine abuse] in general, could have damaged [Petitioner's] case for life before the [ ]sentencing jury. [W]e note that emphasizing [the Petitioner's] alcoholi[sm] and intoxication may also have been damaging to [the Petitioner] in the eyes of the jury. [A] showing of alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing. Precedents show that many lawyers justifiably fear introducing evidence of alcohol and drug use." ... [A] defendant's voluntary drug and alcohol use could be perceived by the jury as *aggravating* instead of mitigating[.]

*Robinson v. Moore*, 300 F.3d 1320, 1349 (11th Cir.2002) (internal quotations and citations omitted).

 Petitioner also claims that trial counsel should have presented the testimony of a second mental health expert to establish the statutory mitigating factors. During the MAR hearing, MAR counsel presented the opinion of Dr. Roy Matthew, a psychiatrist with a specialty in addiction who testified that in May 2000, he went to North Carolina's Central Prison to interview the Petitioner. Respondents' Exhibit KK1, at 102. "Most of my report is based upon my interview with Mr. Powell[,]" which took about two hours. *Id.*, at 102, 129. He did, however, receive transcripts from the trial and the testimony of Dr. Onischenko. *Id.*, at 102. "So those are the only records I have in addition to my interview[.]" *Id.* He did not review transcripts of the testimony of Yelton and Weathers concerning drug and alcohol use on the evening preceding the murder. *Id.*, at 102–03. And, in fact, the only documents relied on by Dr. Matthew were the transcript of Dr. Onischenko's testimony and a copy of the Supreme Court decision. *Id.*, at 130–31. During the May 2000 interview, the Petitioner told Dr. Matthew that in the period leading up to the murder, his cocaine use had tripled from the gram per day testified to by Yelton. *Id.*, at 108. Although Dr. Matthew testified that at the time of the crime the Petitioner had been on a three-day cocaine binge, there was no evidence in the trial transcript of such a binge and it appeared to the state court that Dr. Matthew either assumed this fact or had been told of it by the Petitioner. "So his statement, that statement that he went to the store to get money to steal—to buy more cocaine, which is what he told me, also, is totally consistent with the binge." *Id.*, at 110. And, the state court noted that this conclusion contradicted Yelton's testimony.

In addition, Dr. Matthew limited his opinion. When asked about his degree of certainty that the Petitioner was impaired on the date of the crime and could not appreciate the criminality of his actions, Dr. Matthew replied that "[n]othing is 100 percent certain. There are certain premises to my opinion. One is that he had taken [the drug]. I have no way of knowing that he took it[.]" *Id.*, at 120. In addition, Dr. Matthew testified that the Petitioner claimed he had not consumed any alcohol on the day of the crime. *Id.*, at 122. This is contradictory to the testimony of both Yelton and Weathers. The Petitioner did admit, however, that he

---

4. Petitioner also argues that trial counsel should have presented evidence that habitual use of cocaine leads to violent behavior. However, Dr. Matthew, who testified during the MAR hearing, noted that, based on the Petitioner's report, Petitioner had never suffered a violent episode during or after cocaine use.

used the money he took from the register in the store to buy one-half of a gram of cocaine. *Id.*, at 125. Although that amount should have cost about $20 in 1991, it appeared that the Petitioner had only $6 after the robbery of the store. *Id.*, at 126.

The state court found that the discrepancies between what the Petitioner told Dr. Matthew in 2000 and the 1993 trial testimony of Yelton and Weathers rendered Dr. Matthew's opinion based on noncredible information and in conflict with Dr. Onischenko's opinion. *Bottoson v. Moore,* 234 F.3d 526, 534 (11th Cir.2000), *cert. denied,* 534 U.S. 956, 122 S.Ct. 357, 151 L.Ed.2d 270 (2001). "When there is conflicting testimony by expert witnesses, as here, discounting the testimony of one expert constitutes a credibility determination, a finding of fact. A finding of fact made by a state court is presumed to be correct, and a habeas petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* There is support in the record for the finding of fact to discount Dr. Matthew's testimony. *Id.* Moreover, the state court determined that counsel were not ineffective in failing to obtain the opinion of a second mental health expert and had determined to focus on "the good" the Petitioner had done during his life. Petitioner has failed to show that this conclusion by the state court was either contrary to or an objectively unreasonable application of law. *Chase v. Epps,* 2003 WL 21805917, at *3 (5th Cir.2003) (Defense counsel followed a strategy at sentencing of showing the good in defendant to justify sparing his life rather than trying to portray him as a victim; thus, counsel were not ineffective in failing to obtain further mental evaluations.). "Having received Dr. [Onischenko's] report, counsel understandably decided 'not to spend valuable time pursuing what appeared to be an unfruitful line of investigation.'" *Wilson,*

155 F.3d, at 403 (quoting *Bunch v. Thompson,* 949 F.2d 1354, 1364 (4th Cir.1991)).

In this regard, the Fourth Circuit has ruled directly on such claims of ineffective assistance.

> Our problem with this claim of ineffective assistance is twofold. First, Poyner's complaint here seems aimed not at the performance of his counsel but rather at the performance of Dr. Dimitris[.] The gravamen of this claim is that th[is] psychiatrist[ ][was] not experienced or imaginative enough to recognize that Poyner might have been motivated by sexual sadism ... or some other psychological disorder that might support an argument that Poyner's killings were motivated by more than just a desire to evade capture and prosecution for robbery. However, this court in the past has made clear that there is no right to effective assistance of expert witnesses distinct from the right to effective assistance of counsel. A clear overtone to the argument is the proposition that if a defense attorney has not produced a witness who would agree with the after-the-fact diagnosis presently presented, then the attorney is ineffective. We reject this proposition[.] ... The mere fact that his counsel did not shop around for a psychiatrist willing to testify to the presence of more elaborate or grave psychological disorders simply does not constitute ineffective assistance.

> \* \* \* \* \* \*

> Given counsel's tactical decisions as to the best way to build a case in mitigation, we cannot say that their failure to delve more deeply into the risky realm of psychological mitigation evidence worked to create a reasonable probability that the outcome of any of Poyner's penalty proceedings would have been different. ... We are of opinion that the fact that a line of defense was not drawn

as set out in the [subsequent expert report] does not constitute ineffective representation.

*Poyner v. Murray,* 964 F.2d 1404, 1418–20 (4th Cir.1992) (citations omitted); *accord, Wilson,* 155 F.3d at 403 (Petitioner's "present attempt to challenge his counsel's decision not to investigate mental health issues more fully is 'a product of hindsight and fails to address the facts reasonably relied upon by counsel at the time.'") (quoting *Roach v. Martin,* 757 F.2d 1463, 1478 (4th Cir.1985)). *"Strickland* and several of our cases reflect the reality of death penalty litigation: sometimes the *best* lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder-or, even a less brutal murder for which there is strong evidence of guilt in fact." *Robinson,* 300 F.3d at 1352.

▉ Petitioner also claims counsel were ineffective because they did not request a peremptory instruction as to the (f)(2) and (f)(6) mitigating factors. Under the North Carolina death penalty sentencing procedures, if a jury finds the existence of a statutory mitigating factor, it must accord that factor mitigating value. *State v. White,* 349 N.C. 535, 570, 508 S.E.2d 253, 275 (1998). The effect of a peremptory instruction regarding a statutory mitigating factor is to remove from the jury's determination the issue of whether the evidence shows that factor. *State v. Kirkley,* 308 N.C. 196, 302 S.E.2d 144 (1983), *overruled on other grounds, State v. Shank,* 322 N.C. 243, 367 S.E.2d 639 (1988).

"A defendant is entitled, upon request, to a peremptory instruction on a statutory mitigating circumstance when the evidence supporting the circumstance is uncontroverted." However, "[i]f the evidence supporting the circumstance is controverted or is not manifestly credi-ble, the trial court should not give the peremptory instruction."

*State v. Call,* 353 N.C. 400, 411, 545 S.E.2d 190, 198, *cert. denied,* 534 U.S. 1046, 122 S.Ct. 628, 151 L.Ed.2d 548 (2001) (quoting *State v. Roseboro,* 351 N.C. 536, 547, 528 S.E.2d 1, 8 (2000) and *State v. Hedgepeth,* 350 N.C. 776, 787, 517 S.E.2d 605, 612 (1999)) (other citations omitted). The evidence that the Petitioner had diminished capacity was not uncontroverted. *State v. Cummings,* 352 N.C. 600, 536 S.E.2d 36 (2000), *cert. denied,* 532 U.S. 997, 121 S.Ct. 1660, 149 L.Ed.2d 641 (2001) (The testimony of the evaluator who examined the defendant at the time of trial conflicted with that of the defendant's expert who performed an evaluation 11 years after the murder. Thus, a peremptory instruction was not available.). Although he had a brain dysfunction, he performed normally in some areas. And, while the evidence showed that on the evening of the murder he had been consuming both alcohol and cocaine, it also showed that his consumption had ended approximately six to seven hours prior to the time of death. *State v. Allen,* 323 N.C. 208, 372 S.E.2d 855 (1988), *vacated on other grounds,* 494 U.S. 1021, 110 S.Ct. 1463, 108 L.Ed.2d 601 (1990). The Petitioner drove to and from the store at which the crime was committed and he told the police that he killed the victim because she slapped him and he "went off on her," panicked, and wanted the money from the cash register. *State v. Strickland,* 346 N.C. 443, 464–65, 488 S.E.2d 194, 206–07 (1997) (Statement made to authorities refuted (f)(6) mitigating factor.). Since the Petitioner would not have been entitled to a peremptory instruction in any event, his trial counsel were not ineffective in failing to request the same.

The state court properly considered the totality of the available evidence both at the trial and the MAR hearing. *Woodford, supra.* Its conclusion that the Peti-

tioner did not receive ineffective assistance of counsel was not an unreasonable application of clearly established law; the court applied the correct legal standards; and the decision was based on a reasonable determination of the facts adduced. *Id.*

**B. The death sentence was based on an unconstitutional aggravating factor.**

On direct appeal, the Petitioner claimed that the aggravating circumstance that the murder was committed for pecuniary gain should not have been submitted to the jury because that circumstance violates the Eighth Amendment. The North Carolina Supreme Court rejected his argument. *Powell,* 340 N.C. at 695, 459 S.E.2d at 230.

██ The Petitioner was indicted with and found guilty of "unlawfully, willfully and feloniously" killing the victim, Mary Gladden on October 31, 1991, in violation of N.C. Gen.Stat. § 15–144. Respondents' Exhibit C, at 6. In other words, the Petitioner was charged and convicted pursuant to the first degree felony murder rule which "is the killing of a human being in the perpetration of robbery ...." N.C.P.I.Crim. § 206.14. Obviously, an element of the crime is that the murder occurred during the commission of robbery. Petitioner argues that because the jury had to find beyond a reasonable doubt that he committed robbery, this factor was duplicated when the jury based its decision to sentence him to death on the fact that the "capital felony was committed for pecuniary gain." N.C. Gen.Stat. § 15A-2000(e)(6). This circumstance "did not genuinely narrow the class of persons eligible for the death penalty and did not reasonably justify the imposition of a more severe sentence on Petitioner compared to others found guilty of first degree murder." Petition, at 46. The Petitioner has not cited a single case in support of this claim.

██ A death sentence is not invalid on the ground that the sole aggravating circumstance found by the jury was identical to an element of the capital crime. *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Williams,* 529 U.S. at 392, n. 16, 120 S.Ct. 1495. The Eighth Amendment is not violated because an aggravating circumstance is contained within a crime's definition. *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). The aggravating circumstance sufficiently narrows the class of death-eligible murderers so long as it does "not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder." *Id.* Not every defendant convicted of the felony murder rule will have done so for the purpose of pecuniary gain. Thus, there is no Eighth Amendment violation. The state court did not make an unreasonable application of clearly established law; the court applied the correct legal standards; and the decision was based on a reasonable determination of the facts adduced.

**C. The Petitioner's constitutional rights were violated by the State's failure to make *Brady*[5] disclosures prior to trial.**

In support of this ground, the Petitioner argues the following failures to disclose: (1) Truelove was shown photographs of various suspects in order to eliminate those individuals without including them in the three photographic arrays which occurred on November 2, 3, and 16, 1991; (2) on either October 31, 1991, or November 1, 1991, Truelove was shown mug shot files at the Shelby Police Department and picked photographs of eight individuals whom he identified as having similarities to the man he saw on the night of the

---

**5.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

murder; and, although copies of these photographs were contained within the police files, counsel were unaware of their existence; (3) Commander Ledbetter testified falsely at the suppression hearing relating to the photograph of Webb; (4) a tape-recording of the interview of Truelove conducted during the November 3, 1991, array was never made available to the defense; (5) the State misrepresented that during the November 3, 1991, array, Truelove stated the individual whose picture was in slot number 3 resembled the man he saw; and (6) the State interfered with trial counsel's access to witnesses.

■ Grounds one and two essentially argue that defense counsel was never provided with a list of suspects and/or a list of suspects who had been eliminated, although apparently some of their photographs had been shown to Truelove. The state court, in reviewing these issues, found that

> Ledbetter gave Paksoy and Gilbert unfettered access both to the contents of the [police] master file and the three ring binder [containing information related solely to the Petitioner]. Some of the items from the master file, specifically photographs, were laid out for the trial attorneys' inspection on the table in the Police Department classroom. Paksoy specifically remembered seeing both the "suspects" list and the "suspects eliminated" list. There is no evidence to support defendant's claim that the "suspects" list or the "suspects eliminated" list were withheld from the trial attorneys. From the testimony presented to it, the Court finds that some of the persons whose names were on the "suspects" list prepared by Ledbetter were eliminated by Truelove's failure to pick out their photographs as the man he saw in the Pantry on 31 October 1991. The rest were eliminated after (i) defendant's 16 November 1991 photograph had been

identified by Truelove as the man he saw in the Pantry, (ii) defendant had confessed to the murder of Mary Gladden, and (iii) defendant's confession had been corroborated in part by interviews with Don Weathers.

Respondents' Exhibit QQ, at 27–28.

This Court finds the record supports the state court's conclusions. Both Paksoy and Gilbert acknowledged access to the master file. Ledbetter testified that he personally placed documents containing a listing of suspects on a table for review by defense counsel. Although not required to do so, Ledbetter included in the files the notes of the investigating officers. Assuming *arguendo* that some aspect of the officers' documented investigation failed to make its way into the file,

> "The United States Supreme Court has held that due process does not require the State to make complete disclosure to defendant of all of the investigative work on a case. "[N]o statutory provision or constitutional principle requires the trial court to order the State to make available to a defendant all of its investigative files relating to his case . . . ." Furthermore, N.C.G.S. § 15A–904(a) provides:
>
> > (A) [T]his Article does not require the production of reports, memoranda, or other internal documents made by the prosecutor, law-enforcement officers, or other persons acting on behalf of the State in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses of the State to anyone acting on behalf of the State.
>
> [T]he work product or investigative files of the district attorney, law enforcement agencies, or others assisting in the preparation of the case are not open to discovery[.]"

*State v. Williams,* 355 N.C. 501, 539, 565 S.E.2d 609, 631–32 (2002), *cert. denied,* 537 U.S. 1125, 123 S.Ct. 894, 154 L.Ed.2d 808 (2003) (quoting *State v. Hunt,* 339 N.C. 622, 657, 457 S.E.2d 276, 296 (1994)) (other citations omitted). Nonetheless, the undisputed evidence here is that the police made available everything they had for inspection by the defense counsel.

As for the argument that Truelove was shown photographs on occasions other than the photographic line-ups, the evidence shows that he was allowed to review mug shots and select pictures of individuals having similar characteristics to the man he saw at The Pantry. The fact that not every picture selected was included in the line-up array is of no moment; the evidence shows that defense counsel had access to every photograph selected by Truelove. Petitioner does not argue that the identification procedures were unconstitutional, only that the state withheld exculpatory or potentially impeaching evidence because counsel did not have access to every photograph selected by Truelove as similar to the man he saw in the store.[6] "The most that can be said of these materials is that they might have provided investigatory leads. *Brady* does not require a prosecutor to turn over files reflecting leads and ongoing investigations where no exonerating or impeaching evidence has turned up." *Downs v. Hoyt,* 232 F.3d 1031, 1037 (9th Cir.2000), *cert. denied,* 532 U.S. 999, 121 S.Ct. 1665, 149 L.Ed.2d 646 (2001). " 'The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence *only* known to the Government.' " *Tate v. Wood,* 963 F.2d 20, 25 (2d Cir.1992) (quoting *United States*

*v. LeRoy,* 687 F.2d 610, 619 (2d Cir.1982)). Nor does *Brady* "require a prosecutor to divulge every scintilla of evidence that might conceivably inure to a defendant's benefit." *Lieberman v. Washington,* 128 F.3d 1085, 1092 (7th Cir.1997). The Petitioner's position raises the same points as made in *Downs, supra.*

Downs first contends that the state deprived her of evidence helpful to her defense. While the state provided her with four reports, Downs did not receive information on some 100 leads contained in the sheriff's file, including pictures and names of suspects, license plate numbers of vehicles matching the description given by Downs, and names and phone numbers of citizens and law enforcement officials with potentially relevant information. Downs argues that these matters were material because (1) additional witnesses would have supported her version of the events and provided her with an opportunity to track down the shooter, and (2) they would have shown that Lane County authorities focused almost immediately on her rather than conducting a proper investigation.... The prosecution's suppression of evidence favorable to the accused violates due process when the evidence is material to guilt or to punishment. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."... *Brady* does not require a prosecutor to turn over files reflecting leads and ongoing investigations where no exonerating or impeaching evidence has turned up. Downs' arguments, moreover, are speculative and fail to point out ... how production of these materials would have

---

**6.** In fact, the evidence is to the contrary; those photographs were included in the police master file and had been placed in a stack with a sticker labeled "picked by Truelove."

created a reasonable probability of a different result.

*Downs*, 232 F.3d at 1036–37 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)) (other citations omitted). The state court's finding on this issue was that these photographs

> were not in any way either intended to be nor used as photographic line-ups. They comprised one facet of routine police procedure at the beginning of a murder investigation when no known suspects are immediately involved: they were merely a starting point and were used to aid in constructing a composite upon the verbal description of the perpetrator given by Truelove. The Court further finds that ... these photographs were made available to the trial attorneys by Ledbetter on more than one occasion.

Respondents' Exhibit QQ, at 30. The state court did not make an unreasonable application of clearly established law; the court applied the correct legal standards; and the decision was based on a reasonable determination of the facts adduced.

The Petitioner also argues that Ledbetter testified falsely during the suppression hearing relating to Webb. A suppression hearing was held just before the trial in 1993. Ledbetter testified during that hearing that on November 3, 1991, Truelove reviewed a photo array containing ten pictures and pointed out photograph number 2 as an individual having similarities to the person he saw in the store on the evening before the murder. Respondents' Exhibit B1, at 102. Ledbetter testified that he "believed it was Mr. Webb on number two[.]" *Id.* In fact, Truelove had picked number 3 as an individual having similarities to the Petitioner. That individual was Michael Bailey who was in prison at the time of the murder. This hardly qualifies as lying under oath.

The Petitioner also claims that a tape recording of the interview with Truelove on November 3, 1991, during which he reviewed an array, was never given to defense counsel. However, Ledbetter testified that he made copies of that tape recording and provided a copy to counsel. Nor has counsel shown how this prejudiced the Petitioner since Truelove did not identify him from that array. Although counsel have made various confusing arguments as to how the identification process was inaccurate, no showing has been made as to how such inaccuracies, assuming they occurred, prejudiced the Petitioner. As the trial court noted,

> granted that they did not give you the line-up in the exact order that they presented to the identification witness. They gave you all of the pictures. There was one extra picture of the defendant which was a picture which had been used in the first line-up, only they got that in there by error, according to the testimony. So while you didn't see it in order, tell me how you were prejudiced by not seeing it in the order that they were in as they appeared today? ... [Y]ou did have an opportunity to see the correct order today before the testimony started.
>
> \* \* \* \* \* \*
>
> If there were two photographs ... of the defendant presented at the same time, the same board and identifying witness, then I can understand your contentions that there might be a prejudicial effect but that's not what the evidence is. The evidence is that ... Mr. Truelove was given three pictorial line-ups and in those three pictorial line-ups, there were two pictures of the defendant but none of them in the same line-up and that he failed to identify a [1977] picture of the defendant, [ ] close shaved picture of the defendant, at a time when

[the defendant] weighed much more than he does now even apparently from the picture and that [Mr. Truelove] was subsequently shown a current picture ... and that he did make an identification of that picture. If the order of Judge Johnson was not complied [with] then the Court would find that that noncompliance was through innocent error on the part of the police department. It is not prejudicial.

*Id.,* at 163, 165–66. This conclusion by the state court, upheld and reiterated by the MAR court, was not an unreasonable application of clearly established law; the court applied the correct legal standards; and the decision was based on a reasonable determination of the facts adduced.

Petitioner's final *Brady* argument is that the prosecution's instructions to the police not to cooperate with defense counsel impeded his ability to develop exculpatory evidence. The allegations contained within the petition itself refute the Petitioner's arguments on this score.

On the date of the 6 August 1992 meeting between the District Attorney and Petitioner's trial counsel concerning discovery, ... the District Attorney wrote a letter to Shelby Police Commander Ledbetter advising him that Petitioner's trial attorney[s] were instructed to contact him to make arrangements to inspect the physical evidence and that he was to make copies of any tape recordings for them on blank tapes they would provide. In his ... letter, the District Attorney advised Commander Ledbetter not to discuss the case and to contact the District Attorney if he had any questions regarding that matter.

\* \* \* \* \* \*

In [a] 29 September 1992 cover letter to Chief Cochran, the District Attorney stated that it appeared to him that Commander Ledbetter had discussed evidence obtained by the Shelby Police

Department with Petitioner's trial attorneys and that doing so was contrary to his directions[.]

Petition, at 75. In addition to this admission, both trial counsel testified during the MAR hearing that the police did cooperate with them. Ledbetter testified that he simply ignored the letter because he had been a policeman for 25 years and intended to follow the same procedures he had all of those years. "I have worked, probably, 125 homicides in my career and I've always, you know, dealt with the attorneys, the [d]efense attorneys, fairly and openly and honestly with what I had. I didn't stop then, either." Respondents' Exhibit KK1, at 247. Petitioner's argument as to this issue is frivolous. The state court's decision was not an unreasonable application of clearly established law; the court applied the correct legal standards; and the decision was based on a reasonable determination of the facts adduced.

**D. The admission into evidence of the Petitioner's statements to Ledbetter during interrogation violated the Petitioner's constitutional rights.**

█ The Petitioner claims his statements to Ledbetter were made only after he asked to speak with Ledbetter off the record and after Ledbetter had torn up the *Miranda* waiver previously signed by the Petitioner. Specifically, the Petitioner claims that "[a]fter Cherka left, either Ledbetter told Petitioner that he wanted to talk to Petitioner 'off the record,' or Petitioner told Ledbetter that he wanted to talk to Ledbetter 'off the record' and Ledbetter agreed to do so." Petition, at 79. The Petitioner also claims that just prior to being taken to the station, he had intravenously injected cocaine and taken Xanax. *Id.,* at 80. These allegations are directly contrary to the testimony provided by Ledbetter at the suppression hearing prior to trial.

In reviewing this claim, the North Carolina Supreme Court found that

> [a]ssuming] *arguendo* that the trial court erred by admitting the statements defendant made after Ledbetter destroyed the waiver form, we hold that the error is harmless beyond a reasonable doubt. Before defendant asked to speak off the record, he twice stated that he "went off on" the victim because she slapped him as he tried to rob the store. That voluntary confession, combined with Truelove's positive identification of defendant as the man in the store shortly before the crime and the other strong circumstantial evidence, makes any error in admitting the remainder of defendant's confession harmless beyond a reasonable doubt.

*Powell,* 340 N.C. at 686, 459 S.E.2d at 224. Now, Petitioner's claim that he did not make any confession until after the *Miranda* warning was destroyed is contrary to the finding of the state court. There is nothing in the record indicating that the Petitioner's statements prior to requesting to speak "off the record" were anything other than the product of free and deliberate choice, with full awareness of the right being abandoned and the consequences resulting therefrom. *United States v. Cristobal,* 293 F.3d 134 (4th Cir.), *cert. denied,* 537 U.S. 963, 123 S.Ct. 396, 154 L.Ed.2d 319 (2002). Considering the totality of the circumstances, not the least of which was the fact that the Petitioner had given *Miranda* rights during his tenure as a law enforcement official, there is no evidence that his will was overborne. *Id.; accord, United States v. Elie,* 111 F.3d 1135, 1143–44 (4th Cir.1997), *abrogated by United States v. Sterling,* 283 F.3d 216 (4th Cir. 2002). The state court's decision was not an unreasonable application of clearly established law; the court applied the correct legal standards; and the decision was based on a reasonable determination of the facts adduced.

## VI. ORDER

**IT IS, THEREFORE, ORDERED** that the Respondents' motion for summary judgment is hereby **GRANTED;** and Petitioner's petition for a writ of *habeas corpus* is hereby **DENIED.**

A Judgment dismissing the petition is filed herewith.

### *JUDGMENT*

For the reasons set forth in the Memorandum of Opinion filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that the Respondents' motion for summary judgment is **ALLOWED;** the Petitioner's petition for a writ of *habeas corpus* is **DENIED;** and this matter is hereby **DISMISSED WITH PREJUDICE** in its entirety.