STATE OF NORTH CAROLINA v. THEODORE PITTMAN, JR., Defendant

No. COA04-417

(Filed 6 December 2005)

**1. Homicide— attempted first-degree murder—motion to dismiss—sufficiency of evidence—specific intent to kill**

The trial court did not err by denying defendant's motion to dismiss the charge of attempted first-degree murder of a child, because the State presented sufficient evidence that defendant possessed the specific intent to kill the child including that: (1) defendant left a six-week-old baby with a towel knotted around her face in a collapsing shed some distance from the nearest house with temperatures in the 30-degree range; (2) during the next two days defendant did nothing to retrieve the child or assure her discovery by others; and (3) defendant acted in order to avoid paying child support. A jury could reasonably infer that defendant did not intend for anyone to find or hear the child and that he intended her to die from exposure or lack of food and hydration.

**2. Constitutional Law— right to remain silent—Miranda protections not applicable when questioned by neither an officer nor someone acting as an agent**

The trial court did not commit plain error in a first-degree kidnapping of a child, conspiracy to commit kidnapping, and attempted first-degree murder case by allowing the child's mother to testify regarding defendant's failure to respond to questions she asked him in letters concerning why he kidnapped their daughter, because: (1) the mother's testimony did not reference any silence of defendant in response to questioning by law enforcement, and Miranda's protections apply only when a defendant is subject to custodial interrogation; (2) the mother's questions were posed by her and the record contains no indication that she was acting at the behest of law enforcement; and

(3) even if *Miranda* were applicable, defendant chose not to remain silent when he voluntarily wrote back to the mother.

**3. Constitutional Law— due process—consistency of theories—kidnapping—sex offender registration**

The trial court did not violate defendant's due process rights in a first-degree kidnapping of a child, conspiracy to commit kidnapping, and attempted first-degree murder case by allegedly presenting inconsistent theories at trial when it argued throughout trial that defendant was the child's father but then at sentencing told the court that there was no evidence presented that defendant was in fact the father when it requested that defendant be required to register as a sex offender based on the fact that he kidnapped the child. However, when the case is remanded for resentencing based upon another violation in this case, the trial court should revisit the recommendation regarding registration because there is no basis for requiring defendant to register as a sex offender when the only evidence in the record indicates that defendant is the father of the kidnapped child.

**4. Sentencing— aggravating factor—failure to submit to jury—*Blakely* error**

The trial court erred in a first-degree kidnapping of a child, conspiracy to commit kidnapping, and attempted first-degree murder case by sentencing defendant on an aggravating factor that it found without submitting the factor to the jury, and the case is remanded for resentencing in accordance with *Blakely*, 542 U.S. 296 (2004), and *Allen*, 359 N.C. 425 (2005). However, defendant's argument that the aggravating factor should have been alleged in the indictment has already been rejected by *Allen*.

Appeal by defendant from judgment entered 29 October 2003 by Judge Quentin T. Sumner in Nash County Superior Court. Heard in the Court of Appeals 10 January 2005.

*Attorney General Roy Cooper, by Assistant Attorney General W. Wallace Finlator, Jr., for the State.*

*Marilyn G. Ozer for defendant-appellant.*

GEER, Judge.

Defendant Theodore Pittman, Jr. appeals his conviction of first degree kidnapping of a child, conspiracy to commit kidnapping, and

attempted first degree murder of the child. Defendant argues on appeal primarily (1) that the State failed to present sufficient evidence that defendant had a specific intent to kill the child and (2) that the trial court committed plain error in admitting testimony that defendant had failed to answer the mother's questions regarding why he had taken the child. We hold that the State's evidence was sufficient to defeat a motion to dismiss when it tended to show that, in order to avoid paying child support, defendant, in 30-degree weather, abandoned an infant in a remote, dilapidated shed where she would not likely be found. We further hold that since the record contains no evidence that the mother's inquiries were instigated by the State, they did not constitute custodial interrogation and, therefore, the mother could permissibly testify about defendant's failure to respond to her questions. Although we conclude that defendant received a trial free of prejudicial error, we agree with defendant's subsequently filed motions for appropriate relief that the trial court erred under *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004), in imposing an aggravated sentence. We, therefore, remand for a new sentencing hearing in accordance with *State v. Allen*, 359 N.C. 425, 615 S.E.2d 256 (2005).

Facts

The State's evidence tended to show the following. Daquana Battle testified that defendant was the father of her six-week-old daughter. When Battle told defendant that she was pregnant, he told her that he did not want to go to court, but that "he would pay out of his pocket like he did with his other kids" and that "whenever [she] needed something just to call and he would get it to [her]." After the baby was born, however, Battle's mother told defendant that she was going to take him to court to force him to make child support payments.

David Parker, defendant's former roommate, testified that on 4 November 2002, defendant asked him to help take the baby from Battle. Parker believed that defendant wanted to avoid paying child support. Defendant told Parker that he would get Battle to leave her house by calling her on the phone and that Parker could then go into the house and take the child. After defendant promised to "take care" of Parker, Parker agreed to the plan.

Defendant and Parker drove to Battle's house. Battle and her daughter were lying in bed when defendant called and asked if he could talk to Battle about a Christmas present for the baby. Battle

walked outside to talk with defendant, leaving her daughter on the bed. The conversation lasted for about 10 to 15 minutes. During that time, Parker entered the house, went into the bedroom, picked up the baby, and left the house by the back door while holding the baby underneath his jacket. As Battle started to go back inside her house, defendant blew his car horn—the agreed-upon sign to let Parker know Battle was returning. At the sound of the horn, Battle turned around, but defendant looked as if he was motioning to someone else.

Battle then turned back towards the house and saw Parker running from the back door towards defendant's car with "his arms balled up." When Parker saw Battle he changed direction and started running toward the backyard. After Battle went back inside, defendant telephoned her again and explained that he had been honking at his cousin. While on the phone, Battle realized her daughter was missing and told defendant. After defendant asked her not to call the police or her mother because he had "to drop this dope off," Battle waited 20 minutes and then called both the police and her mother.

In the meantime, Parker had walked with the baby back to his house where he met defendant. The two men then drove with the baby to a house owned by Stan Dempsey that was located in the country, a few miles south of Rocky Mount. When they arrived at Dempsey's house, defendant knocked on the door; but there was no answer. Defendant told Parker to take the child to an unheated shed located approximately 100 yards from the house. The shed had partially collapsed and there were shrubs and trees growing all around it. Inside, the shed was full of trash, debris, broken glass, and bottles, and the ceiling rafters had come down and were leaning. Parker left the child in the center of the shed. As defendant and Parker were leaving, Dempsey walked outside. Defendant told Dempsey that he would return later. Later that morning, defendant called Dempsey and told him that "he might need [Dempsey] to cover something [up]."

When Edward Collins of the Rocky Mount Police Department responded to Battle's call, Battle told him that defendant was angry about the prospect of paying child support because he already had other children and did not need additional financial responsibilities. Defendant subsequently returned to Battle's house. During Collins' interview of defendant, defendant showed no "outward emotion" and claimed he did not know that the baby was missing. Defendant and Battle then went to ask Parker to return to Battle's house, but when Parker saw the police, he left immediately.

That evening, the police arrested Parker, who admitted that he had helped defendant take the baby from Battle's house. Following defendant's arrest, defendant claimed he did not know why Parker would implicate him. Defendant continued to deny any type of involvement in the baby's disappearance. At some point on the evening of 4 November 2002, defendant called Dempsey and said that "Parker had got [defendant] in some trouble."

Two days later, Dempsey called the Rocky Mount Police Department after reading a story about a baby being kidnapped accompanied by defendant's and Parker's pictures. Dempsey told Detective Mike Lewis that he had seen defendant and Parker at his house on the morning of 4 November 2002. After talking with Dempsey, Detective Lewis began searching and found the baby lying on some dirt behind a pile of trash in the shed. The child's mouth and nose were covered with a towel tied in a knot and she did not have a jacket or coat. During the two days that the child was missing, it had rained and the temperature had dropped into the 30s. At first, the officers thought the baby was dead, but they rushed her to the hospital once they realized she was still alive.

On 13 January 2003, defendant was indicted on one count of attempted first degree murder, one count of first degree kidnapping, and one count of felony conspiracy. At trial, defendant testified on his own behalf. According to defendant, Parker told defendant at 3:30 a.m. on the day the baby disappeared (1) that he owed a large amount of money to Jamaican drug dealers and needed help and (2) that Battle's mother had threatened to go to the police about Parker's sexual activity with Battle's younger sister. Defendant testified that he did not see Parker until later that day when he and Battle asked Parker to come to the house to help look for the baby. Defendant claimed that he learned the child was missing when he was driving to Dempsey's house to "cook cocaine." Defendant denied any part in the kidnapping and testified he thought Parker took the baby because Parker was mad at defendant for moving out and leaving him to pay the bills.

The jury found defendant guilty on all three counts. During sentencing, the trial judge found as an aggravating factor that the victim was very young and found as mitigating factors that defendant had been honorably discharged from the armed services, had supported his family, and had a support system in the community. The judge determined that the aggravating factor outweighed the mitigating factors and sentenced defendant in the aggravated range to consecutive

sentences of 196 to 245 months on the attempted murder conviction, 92 to 120 months on the first degree kidnapping conviction, and 80 to 105 months on the conspiracy conviction. Defendant timely appealed and, while this case was pending on appeal, filed two motions for appropriate relief based on *Blakely*.

I

**[1]** Defendant first assigns error to the trial court's denial of his motion to dismiss, arguing that the State presented insufficient evidence that defendant had a specific intent to kill the child. When considering a motion to dismiss for insufficient evidence, the trial court must determine whether the State has presented substantial evidence of every essential element of the crime and that the defendant was the perpetrator. *State v. Robinson*, 355 N.C. 320, 336, 561 S.E.2d 245, 255, *cert. denied*, 537 U.S. 1006, 154 L. Ed. 2d 404, 123 S. Ct. 488 (2002). " 'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *State v. Matias*, 354 N.C. 549, 552, 556 S.E.2d 269, 270 (2001) (quoting *State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984)). The evidence must be viewed "in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), *cert denied*, 515 U.S. 1135, 132 L. Ed. 2d 818, 115 S. Ct. 2565 (1995).

The elements of attempted first degree murder are: "(1) a specific intent to kill another; (2) an overt act calculated to carry out that intent, which goes beyond mere preparation; (3) malice, premeditation, and deliberation accompanying the act; and (4) failure to complete the intended killing." *State v. Tirado*, 358 N.C. 551, 579, 599 S.E.2d 515, 534 (2004), *cert. denied sub nom. Queen v. North Carolina*, 544 U.S. 909, 161 L. Ed. 2d 285, 125 S. Ct. 1600 (2005). Rather than simply showing that a defendant committed an intentional act that could have resulted in death, the State "must show that the defendant intended for his action to result in the victim's death." *State v. Keel*, 333 N.C. 52, 58, 423 S.E.2d 458, 462 (1992). Defendant argues only that the State failed to present sufficient evidence of a specific intent to kill.

Because the intent to kill involves a state of mind, " 'ordinarily it must be proved, if proven at all, by circumstantial evidence, that is, by proving facts from which the fact sought to be proven may be reasonably inferred.' " *State v. Alexander*, 337 N.C. 182, 188, 446 S.E.2d

83, 86-87 (1994) (quoting *State v. Ferguson*, 261 N.C. 558, 561, 135 S.E.2d 626, 629 (1964)). "Moreover, an assailant 'must be held to intend the natural consequences of his deliberate act.' " *State v. Grigsby*, 351 N.C. 454, 457, 526 S.E.2d 460, 462 (2000) (quoting *State v. Jones*, 18 N.C. App. 531, 534, 197 S.E.2d 268, 270, *cert. denied*, 283 N.C. 756, 198 S.E.2d 726 (1973)).

After reviewing the record, we hold that the State presented sufficient evidence that defendant possessed the specific intent to kill the child. The State offered evidence that defendant left a six-week-old baby with a towel knotted around her face in a collapsing shed some distance from the nearest house with temperatures in the 30-degree range. During the next two days, defendant did nothing to retrieve the child or assure her discovery by others. A jury could reasonably infer from this evidence that defendant did not intend for anyone to find or hear the child and that he intended her to die from exposure or lack of food and hydration. The State also offered evidence that defendant acted in order to avoid paying child support, a goal that a jury could reasonably infer could only be ensured by the death of the child. Based upon this circumstantial evidence, the trial court properly denied the motion to dismiss. *See, e.g., State v. Evangelista*, 319 N.C. 152, 158-59, 353 S.E.2d 375, 380-81 (1987) (holding that the evidence was sufficient to prove a specific intent to kill when the defendant barricaded himself in a railroad compartment with an eight-month-old infant, the defendant was warned that the child would dehydrate without water, and the defendant nonetheless consistently prevented attempts to provide the child with water for three days); *State v. Edwards*, 174 N.C. App. 490, 497-98, 621 S.E.2d 333, 338 (2005) (holding that evidence of a specific intent to kill was sufficient when, during the summer, the defendant left a baby in the sun in a remote location where he was unlikely to be found).

Defendant's arguments regarding alternative interpretations of the evidence present questions of fact for the jury and do not support dismissal. This assignment of error is, therefore, overruled.

II

[2] Defendant next contends that the trial court committed plain error in allowing Battle to testify regarding defendant's failure to respond to questions she asked him in letters. While defendant was awaiting trial, Battle wrote letters to defendant asking him why he had kidnapped their daughter. Battle testified that although

defendant replied to the letters, he never answered the questions. Defendant argues that this testimony impermissibly referenced defendant's invocation of his right to remain silent after *Miranda* warnings had been given.

It is well established that "a defendant's exercise of his constitutionally protected rights to remain silent and to request counsel during interrogation may not be used against him at trial." *State v. Elmore*, 337 N.C. 789, 792, 448 S.E.2d 501, 502 (1994). As the United States Supreme Court first held in *Doyle v. Ohio*, 426 U.S. 610, 618, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245 (1976), the *Miranda* warnings contain an implicit assurance to a person who is given them that he will not be penalized for his post-arrest silence. "In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.*

The rule set out in *Elmore* and *Doyle* does not, however, apply to the facts of this case. Battle's testimony did not reference any silence of defendant in response to questioning by law enforcement. *Miranda's* protections apply only when "a defendant is subject to custodial interrogation." *State v. Barden*, 356 N.C. 316, 337, 572 S.E.2d 108, 123 (2002), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074, 123 S. Ct. 2087 (2003). "Custodial interrogation" refers to " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *State v. Kincaid*, 147 N.C. App. 94, 101, 555 S.E.2d 294, 300 (2001) (quoting *State v. Clay*, 297 N.C. 555, 559, 256 S.E.2d 176, 180 (1979), *rev'd on other grounds by State v. Davis*, 305 N.C. 400, 290 S.E.2d 574 (1982)). *Miranda* is not implicated when a person is questioned by someone who is neither a law enforcement officer nor acting as an agent of law enforcement. *State v. Powell*, 340 N.C. 674, 687, 459 S.E.2d 219, 225 (1995) (concluding that no violation of *Miranda* occurred when private individuals, not acting as agents of the police, tape-recorded the defendant), *cert. denied*, 516 U.S. 1060, 133 L. Ed. 2d 688, 116 S. Ct. 739 (1996); *In re Phillips*, 128 N.C. App. 732, 735, 497 S.E.2d 292, 294 ("[F]ree and voluntary statements made without *Miranda* warnings to private individuals unconnected with law enforcement are admissible at trial."), *disc. review denied*, 348 N.C. 283, 501 S.E.2d 919 (1998). Since the questions in this case were posed by Battle and the record contains no indication that Battle was acting at the behest of law enforcement, defendant's silence was not in response to a custodial interrogation. Accordingly, admission of

testimony regarding that silence did not violate the assurances set out in the *Miranda* warnings. *See State v. Mitchell*, 317 N.C. 661, 667, 346 S.E.2d 458, 462 (1986) ("The prosecutor did not attempt to capitalize on the defendant's reliance on the implicit assurances of the *Miranda* warnings, the concern embodied in the *Doyle* decision.").

Additionally, even if *Miranda* were applicable, defendant chose not to remain silent. When Battle wrote to defendant, he voluntarily chose to write back. As our Supreme Court held in *Mitchell*, the principles set out in *Doyle* do not apply when "the defendant did not exercise his right to remain silent after receiving Miranda warnings," but rather voluntarily spoke. *Id.* In that situation, the prosecutor may inquire about the defendant's failure to disclose certain matters during that voluntary post-*Miranda* warnings conversation. *Id.* The trial court thus did not commit error in admitting Battle's testimony about defendant's responses to her letters.

III

**[3]** Defendant next argues that the State presented inconsistent theories at trial, violating his right to due process. Defendant points to the fact that the State argued throughout the trial that defendant was the child's father, but then at sentencing told the court that there was no evidence presented that defendant was in fact the father and requested that defendant be required to register as a sex offender.

The State's theory of this case was that defendant wanted to kidnap and kill the baby because he did not want to pay child support to Battle. Battle testified that defendant was the father of her child and multiple witnesses testified regarding defendant's desire to avoid paying child support. No evidence was presented suggesting defendant was not the baby's father. Nevertheless, following sentencing, the State argued to the trial court that defendant should "have to register as a sex offender being that he kidnapped a child and that there's been no proof that he's the parent of the child." On the judgment, the trial court recommended that defendant be required to register as a sex offender.

"Equitable estoppel prevents one party from taking inconsistent positions in the same or different judicial proceedings, and 'is an equitable doctrine designed to protect the integrity of the courts and the judicial process.' " *State v. Taylor*, 128 N.C. App. 394, 400, 496 S.E.2d 811, 815 (quoting *Medicare Rentals, Inc. v. Advanced Servs.*, 119 N.C. App. 767, 769, 460 S.E.2d 361, 363, *disc. review denied*,

342 N.C. 415, 467 S.E.2d 700 (1995)), *aff'd per curiam*, 349 N.C. 219, 504 S.E.2d 785 (1998). Even assuming that the principle of judicial estoppel may be applied against the government in a criminal proceeding, the State's inconsistent positions in this case regarding paternity do not require a new trial. The State's theory throughout trial was that defendant was the father, and at no point did the State deviate from that position. It was only after trial and sentencing—and for the purpose of an entirely different statute, registration of sex offenders—did the State assert that there was no evidence of paternity. The inconsistent position only resulted in a "recommendation" by the trial judge that defendant be required to register as a sex offender. We can perceive of no prejudice with respect to the jury's verdict.

As held below, however, this case must be remanded for resentencing. Upon resentencing, the trial court should revisit the recommendation regarding registration. We note that the only evidence in the record indicates that defendant is the father of the kidnapped child. The State's assertion to the trial judge "that there's been no proof that he's the parent of that child" is incorrect. On this record, there is no basis for requiring defendant to register as a sex offender. The kidnapping of a child is deemed an offense against a minor only if the offense was not committed by a parent of the minor. N.C. Gen. Stat. § 14-208.6(1i) (2003).

IV

[4] While this case was on appeal, defendant filed two motions for appropriate relief arguing that his sentence violates the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004), because the trial court imposed an aggravated sentence based on judicially-found facts. We agree.

Our Supreme Court addressed the impact of *Blakely* in *State v. Allen*, 359 N.C. 425, 615 S.E.2d 256 (2005), holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed presumptive range must be submitted to a jury and proved beyond a reasonable doubt." *Id.* at 437, 615 S.E.2d at 265 (citing *Blakely*, 542 U.S. at 303-04, 159 L. Ed. 2d at 413-14, 124 S. Ct. at 2537; *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348, 2362 (2000)). The failure to do so constitutes structural error and is reversible *per se. Id.* at 449, 615 S.E.2d at 272.

Because the trial court based defendant's sentence on an aggravating factor that it, rather than a jury, had found, we must vacate the sentence and remand for resentencing in accordance with *Blakely* and *Allen*. With respect, however, to defendant's argument that the aggravating factor should have been alleged in the indictment, the Supreme Court rejected that argument in *Allen*. *Id.* at 438, 615 S.E.2d at 265.

No error in part, reversed in part, and remanded for resentencing.

Chief Judge MARTIN and Judge CALABRIA concur.